# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
JULIAN ALEJANDRO MENDEZ,
Defendant and Appellant.

S129501

Riverside County Superior Court
RIF090811

July 1, 2019

Justice Cuéllar authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Kruger, and Groban concurred.

# PEOPLE v. MENDEZ
## S129501

### Opinion of the Court by Cuéllar, J.

This case concerns the murders of Michael Faria and Jessica Salazar. The People charged three members of a gang called North Side Colton with murdering Faria after he claimed allegiance to a rival gang called West Side Verdugo, and with murdering Salazar after she witnessed Faria's killing. The three gang members charged here were Joe "Gato" Rodriguez, Daniel "Huero" Lopez, and Defendant Julian Alejandro "Midget" Mendez. Mendez was tried jointly with Rodriguez and Lopez, but by a separate jury. Mendez was convicted and sentenced to death. This automatic appeal concerns him alone. We affirm.

## I. BACKGROUND

Among the most crucial evidence presented against Mendez at trial was testimony from two people: a friend of the accused, Samuel "Devil" Redmond, who pleaded guilty to first degree murder to avoid the death penalty; and a friend of the victims, Sergio Lizarraga. The following description of the crimes relies primarily on accounts from these two witnesses.

### A. The Murder of Michael Faria

Redmond and Mendez had been friends since childhood and shared an apartment in Colton, California. At trial, Redmond testified about what happened on the night of the killings. He and Mendez drank alcohol and smoked methamphetamine in their apartment with Lopez, Mendez's eventual codefendant. The three men then set out in Redmond's

1

SUV, a black Nissan Pathfinder, to meet up with friends living at a nearby Four Seasons apartment complex.  There, they encountered Mendez's other eventual codefendant, Rodriguez, who suggested they meet some fellow North Side Colton gang members — specifically, Art "Rascal" Luna and his brothers — at their house on Michigan Street in Colton.  When the four of them arrived, they saw Luna in a car with a "bunch of kids."  And walking along the street was another group of kids, whom Redmond estimated were 15 or 16 years old.

Among this latter group were the murder victims in this case:  Michael Faria and Jessica Salazar.  With them were Lizarraga, Greg Frias, and David Flores.  Lizarraga later provided the most detailed witness account of Faria's death.  According to Lizarraga's testimony, he and his four companions saw a black SUV park across the street.  The man who appeared to have been the driver emerged from the car and walked to the house.  Two other men exited the SUV and struck up a conversation with Salazar.  Faria and Flores were standing nearby.  When Lizarraga beckoned them, they started to walk away.  Then one of the two men said to Salazar, "I think I know you."  She turned around and started talking to him again.

At that moment, the man who appeared to have been driving the SUV walked up to Lizarraga and Faria.  Faria asked him, "Where are you from?"  Without answering, the man put the question back to Faria.  Faria answered, "I back[] up the West."  The man retorted, "Fuck the Westside.  North [S]ide Colton."  That worried Lizarraga, who interpreted the back-and-forth as an escalating gang challenge.  Seeking to calm the situation, Lizarraga tried to get between the man and Faria, telling the latter, "It's cool.  Just chill out, walk away."  Then, as Lizarraga turned around, the man punched him in the face.

Lizarraga persisted in trying to de-escalate the situation. Moments later, he saw Flores being chased. At that point, Faria was still standing next to Lizarraga. But then a group of people descended on Faria and beat him to the ground. Lizarraga, having backed away, started running towards Faria. Someone grabbed Lizarraga by the shirt. Salazar intervened and told Lizarraga's would-be assailant, "No he's cool. He's not from the West." The man let go. But before Lizarraga could do anything else, someone shot Faria. Lizarraga would later tell law enforcement that he was 75 percent sure Rodriguez shot Faria, but at trial he could not "remember any faces from that night."

Redmond testified that, after he alighted from the SUV, he saw Mendez, Rodriguez, and Lopez talking to Salazar. Redmond and Lopez began to walk towards Luna's house across the street, leaving Mendez and Rodriguez with Salazar and her friends. Moments later, Redmond heard an argument. Then, standing with Lopez and Luna, Redmond saw a fight break out and a crowd gathering. A chase involving Mendez and Rodriguez ensued. Redmond stayed put, but Lopez and Luna, the latter of whom had just been handed a gun by his younger brother, started walking towards the fray. Lopez quickly turned around and sprinted back. He told Redmond, "Hurry up. Let's go get Midget." So the two men ran back to the SUV and started driving. Soon after, they saw Mendez and Rodriguez racing their way. Mendez was holding a gun.

## B. The Murder of Jessica Salazar

Redmond also testified about the next few minutes, which resulted in a second killing. Once he, Lopez, Rodriguez, and Mendez were back in Redmond's SUV, they saw Salazar on the sidewalk "going hysterical," "crying," and "not knowing where to

go." Mendez directed Rodriguez to tell Salazar that she should get into the SUV, since they knew each other. Rodriguez did so, and she complied. Mendez told Redmond, "Drive. Get [us] out of here." After stopping back at the Four Seasons, they entered the freeway and drove. Salazar, meanwhile, was "going nuts," crying, and asking repeatedly, "Why did you do that?"

With fuel running low, Redmond pulled into a gas station. Although at trial his memory of what happened next was "foggy," Redmond recalled going to the bathroom with Mendez. Either Lopez or Rodriguez joined them, and the other stayed near the car with Salazar. Mendez said, "She's gotta die."

From there, they got back in the SUV and started driving again. Redmond drove for 20 to 30 minutes before coming upon a dirt road. They took it. Eventually, someone said, "I gotta take a piss." Redmond pulled over, and the four men got out. The area was dark and deserted. "She's gotta die. She's gotta die," Mendez repeated. He urged Rodriguez to kill Salazar, saying, "You know her" and "[s]he's going to identify you." Rodriguez refused. But when Mendez told him to "drag her out," Rodriguez pulled Salazar from the SUV. She panicked, crying, "Stop it" and "Don't." Rodriguez got back in the SUV, leaving Mendez and Redmond alone with Salazar. Mendez was holding a gun, and Salazar was pleading for her life. Mendez told Redmond to hold her. But Salazar tripped. She fell, started to get up, raised her hands — and Mendez shot her.

Moments later, someone saw a car approaching and said, "Come on, let's go." Mendez responded, "No, I have to put two in her head." He tried to shoot Salazar again, but the gun jammed. Seeing this, and wary of the oncoming car, Redmond said, "I'm leaving." Mendez gave up on trying to clear the jam

and got into the car with Redmond, Lopez, and Rodriguez. They drove off into the night.

## C. Aftermath

Redmond further testified about what happened after he, Rodriguez, Lopez, and Mendez departed from the scene of Salazar's killing. They set out for Redmond and Mendez's apartment. During the drive, Mendez suggested burning the SUV to get rid of the vehicle, saying he wanted to ensure they "[c]an't tie it back to me." Redmond responded, "You're fucking crazy. It's my truck. I paid for it."

When they arrived at the apartment, Mendez directed Redmond not to park in front of the building. Once inside, Mendez took everyone's shoes and clothing and put them in a bag. He also walked them through setting up alibis. Mendez suggested that Redmond and Lopez say that they were at a motel the whole night with two female friends. Mendez planned to say he was with his girlfriend at the apartment. It is unclear whether Rodriguez crafted an alibi. Several days later, Mendez's older brother told Redmond to switch the tires on his SUV with those from a white Isuzu Rodeo — an SUV similarly sized to Redmond's Nissan Pathfinder — which Redmond did. Mendez was later arrested driving the Rodeo, and its tires matched the tracks found near Salazar's body.

## D. Trial

At the guilt phase of his trial, a jury found Mendez guilty of first degree murder for the killings of both Faria and Salazar. It also found true two special circumstances: that Mendez committed multiple murders under Penal Code section 190.2, subdivision (a)(3) and, as to the Salazar murder, that he killed a witness to prevent her testimony in a criminal proceeding

under section 190.2, subdivision (a)(10).[1]  Finally, the jury found three enhancements to be true.  It found that Mendez personally discharged a firearm causing the deaths of both Faria and Salazar, within the meaning of section 12022.53, subdivision (d); that he personally discharged a firearm causing the deaths of both Faria and Salazar for the benefit of, at the direction of, or in association with a criminal street gang, within the meaning of sections 12022.53, subdivision (e), and 186.22, subdivision (b)(1); and that he committed both murders for the benefit of, at the direction of, or in association with a criminal street gang, within the meaning of section 186.22, subdivision (b)(1).

At the penalty phase, the jury returned a death sentence against Mendez on the two counts of first degree murder, which the trial court imposed.  The trial court also sentenced Mendez to 56 years to life in prison on the enhancements.

## II.  DISCUSSION

Mendez mounts multiple challenges to his convictions and death sentence, which we consider in turn.  None warrants reversal.

### A.  The Gang Expert's Testimony

A law enforcement gang expert named Jack Underhill testified at Mendez's trial.  His testimony addressed gang culture, the rivalry between the two gangs involved in this case, and Mendez's prior contacts with law enforcement.  Mendez argues that the trial court erred by permitting Underhill's testimony about Mendez's prior contacts with police, as well as his testimony about two other gang-related shootings.  Mendez

---

[1]     All subsequent statutory references are to the Penal Code unless otherwise noted.

argues that these portions of Underhill's testimony were improper for two reasons. First, he argues they were irrelevant or, at the very least, substantially more unfairly prejudicial than probative. (See Evid. Code, §§ 350, 352.) Second, he contends they contained testimonial hearsay that, under our decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), was inadmissible.

We begin by describing Underhill's testimony in some detail. Then we analyze the portion of his testimony chronicling Mendez's prior police contacts. On this record, we conclude the trial court did not abuse its discretion in finding this testimony relevant and its probative value not substantially outweighed by the risk of unfair prejudice. We further conclude Mendez failed to preserve his claim of *Sanchez* error arising from this portion of Underhill's testimony. As for Underhill's testimony about two other gang-related shootings, any error in admitting it was harmless under any standard.

### 1. Facts

Mendez and his codefendants stipulated that North Side Colton "is a criminal street gang . . . whose members have engaged in a pattern of criminal gang activity, including, but not limited to, murder, attempt[ed] murder, drive-by shooting, robberies, carjackings and witness intimidation." They further stipulated that they "are, and were at all relevant times, members" of that gang. At trial, the People called Underhill as an expert witness on criminal gangs. Underhill was a 10-year veteran of the Colton Police Department possessing extensive experience with local gangs, including North Side Colton and West Side Verdugo.

Underhill described how he and other officers tracked gang activity in the area. Specifically, he told the jury that officers regularly fill out reports called "S.M.A.S.H. cards" — which stands for "San Bernardino County Movement Against Street Hoodlums." Whenever they contact gang members or suspected gang members, officers "briefly talk with them and try to find out exactly what their involvement" with the gang is. They also take a photo if necessary. Officers record the information on S.M.A.S.H. cards, which the police department collects and maintains. But Underhill admitted that anyone reading a S.M.A.S.H. card is "at the mercy" of whichever officer filled it out in terms of accuracy.

Underhill also described various aspects of gang culture. He explained how gangs often have characteristic hand signs and tattoos that members use to identify themselves. They also induct new members through various forms of initiation. Underhill further explained that gangs tend to establish themselves in certain geographic areas — what gang investigators call "turf." Given this emphasis on turf, simply asking, "Where are you from" is a direct challenge in gang culture. Because gangs are particularly concerned with earning "respect" — which, according to Underhill, is more about instilling fear — such challenges demand an immediate reply. And violent acts committed by one gang against another demand an even more violent response.

Underhill then chronicled for the jury the longstanding rivalry between Mendez and his codefendants' gang (North Side Colton) and Faria's gang (West Side Verdugo). Underhill explained that those two gangs shared "a well-known hatred that's been going on for years due to numerous incidents." One of those incidents was the 1994 murder of North Side Colton

member Jesse "Sinner" Garcia. Another such incident was the July 1998 murder of Cindy Rodriguez — the mother of Mendez's codefendant, Joe "Gato" Rodriguez.

Faria — the first victim in this case — was killed on February 4, 2000. After confirming that Underhill had heard Lizarraga's testimony about the Faria killing, the People asked Underhill to evaluate Lizarraga's description of what was said at the start of the fatal encounter. In Underhill's opinion, the back-and-forth that ensued after Faria asked "Where are you from" meant that "the situation [wa]s escalating" and getting "[m]ore and more dangerous." Killing Faria would "build[] a reputation in the gang world that North Side Colton will do this kind of thing . . . in hopes that other gangs will fear them." For that reason, Underhill agreed that the Faria shooting was "committed for the benefit of, at the direction of, [and/or] in association with . . . members of North Side Colton." Underhill further opined that there was "no doubt in [his] opinion that [Salazar] was killed because she could identify" the gang members who shot Faria, basing that view in part on Redmond's testimony "that Mendez said the girl had to die." So the Salazar shooting was also, in Underhill's opinion, committed for the benefit of, at the direction of, and in association with members of North Side Colton.

Underhill went on to chronicle five contacts Mendez had with police in the years before the Faria and Salazar murders. Those contacts were documented on a "gang board" displayed to the jury. Underhill was not present for those contacts, and the officers who were present did not testify at trial. The People first asked Underhill whether officers from his department encountered Mendez on May 1, 1994 while investigating the shotgun killing of a rival gang member John Rojas. Underhill

told the jury that Mendez was present for the murder and that detectives questioned him about it. Mendez allegedly admitted the following to the investigating officers: he "heard two or three shotgun blasts," "saw the victim on the ground," and fled the scene in a car with the alleged shooter — Art Luna's brother, Daniel "Chato" Luna.

Four days later, Underhill continued, a police officer stopped a car with Mendez inside. Also in the car were Daniel Luna (Rojas's alleged killer), Jesse Garcia (who would be gunned down just weeks later), and a third member of North Side Colton. Seven days after that, Underhill asserted Mendez was found by other officers "riding in a stolen [car] after a long high-speed chase" that ended with the car crashing into a police vehicle. Two other members of North Side Colton were in the stolen car with Mendez. The investigating officer filled out a S.M.A.S.H. card about the incident, on which Mendez purportedly drew gang graffiti and admitted being a member of North Side Colton with the gang moniker "Midget." According to Underhill, "Daniel Luna was charged with the murder of Rojas," but Mendez "was not charged with any crime in any way relating to the shooting of Rojas." Underhill further asserted that law enforcement never made a connection between the Rojas and Garcia killings.

Underhill next relayed to the jury a fellow officer's account of an alleged drive-by shooting that occurred on December 7, 1995. That officer heard multiple gunshots and saw a car in the "immediate vicinity driving ten miles per hour." The officer pulled the car over. A member of North Side Colton was driving, and Mendez was in the passenger seat. Inside the car, Underhill continued, the officer found "a fully-loaded .22 caliber handgun in the center console," along with a "fully loaded M1 .30 caliber

10

carbine, a loaded SKS 7.62 high-powered rifle, a loaded 12-gauge shotgun and a .38 caliber revolver" in the trunk. The barrel of the shotgun, according to Underhill's description of the officer's account, "was still warm to the touch." The officer patted down Mendez and found a live .22-caliber round in Mendez's pants pocket, along with two more such rounds on the ground nearby.

Finally, Underhill told the jury about another contact Mendez had with police on a street corner in October 1996. Mendez, according to Underhill, told the officers on scene that he was a member of North Side Colton.

### 2. Analysis of the Gang Expert's Testimony Chronicling Mendez's Prior Police Contacts

On this record, the trial court did not commit reversible error by letting Underhill tell the jury that other officers had previously: (1) questioned Mendez after Rojas's murder and obtained an admission that he fled the scene in the same car as the alleged killer, a fellow North Side Colton member; (2) stopped a car in which Mendez was again riding with Rojas's alleged killer; (3) found Mendez with North Side Colton members in a stolen car that crashed into a police vehicle after a high-speed chase; (4) stopped Mendez and a fellow North Side Colton member driving suspiciously near an apparent drive-by shooting and discovered an arsenal of guns inside the car; and (5) had a conversation with Mendez during which he admitted being a member of North Side Colton.

Testimony about these five prior police contacts was relevant, and the trial court did not abuse its discretion in declining to find that the probative value of this testimony was *substantially* outweighed by the risk of unfair prejudice. (See

Evid. Code, §§ 350, 352.) By showing Mendez's "commitment to" North Side Colton, this testimony was relevant to proving the charged gang enhancements and, relatedly, to explaining Mendez's motive for committing the murders. (*People v. Valdez* (2012) 55 Cal.4th 82, 131.) We recognize that gang-related evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition" and that such evidence should therefore "be carefully scrutinized by trial courts." (*People v. Carter* (2003) 30 Cal.4th 1166, 1194 (*Carter*).) But on this record, Mendez's prior police contacts had considerable probative value. Taken together, they tended to show Mendez actively involved himself in the gang's criminal activities, rather than just passively claimed the gang among his peers. What's more, the trial court "properly instructed the jury on the limited purposes for which it was admitting the gang evidence." (*Id.* at p. 1196.) So under our precedents, we cannot say the trial court abused its discretion. (See, e.g., *ibid.*; *People v. Williams* (1997) 16 Cal.4th 153, 192 [holding that the trial court did not abuse its discretion in admitting gang evidence, including testimony that the defendant led a meeting between two gangs where they planned to kill rival gang members]; *People v. Gutierrez* (2009) 45 Cal.4th 789, 819-820 [holding that the trial court did not abuse its discretion in admitting gang evidence, including notes to fellow gang members recovered in defendant's cell that contemplated the intimidation and murder of prosecution witnesses].)

Mendez makes, and we reject, another argument about Underhill's testimony. Mendez contends that, under our decision in *Sanchez*, the trial court erred by letting Underhill testify about Mendez's prior police contacts. Like this case, *Sanchez* involved testimony from a gang expert. (*Sanchez,*

*supra*, 63 Cal.4th at p. 670.) What we recognized in *Sanchez* is that an expert witness may rely on hearsay in explaining the basis for his or her "general knowledge" about "matters 'beyond the common experience of an ordinary juror.' " (*Id.* at p. 676, quoting *People v. McDowell* (2012) 54 Cal.4th 395, 429.) An expert may also "rely on information within [his or her] personal knowledge" and "give an opinion based on a hypothetical including case-specific facts that are properly proven" by other admissible evidence. (*Sanchez*, at p. 685.) "What an expert *cannot* do," we held in *Sanchez*, "is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.) And if, in a criminal case, a prosecution expert "seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Ibid.*)

The People concede that much of Underhill's testimony about Mendez's prior police contacts amounted to testimonial hearsay under *Sanchez*. But given the specific circumstances of this case, we conclude Mendez failed to preserve his claim of *Sanchez* error as to that portion of Underhill's testimony.

The relevant facts are as follows. Counsel for Mendez's codefendant (Lopez) lodged a hearsay objection to Underhill's proposed testimony about Lopez's prior police contacts. Those contacts were documented on a gang board similar to the one used in connection with Underhill's testimony about Mendez. This led the trial court to acknowledge that Lopez's attorney had "a good point about the hearsay," and to indicate that it would allow this aspect of Underhill's testimony only with "proper

13

foundation." In response, the prosecutor represented to the court and the defendants that "every one of those officers is available to be called as a witness" if need be — but suggested they "allow the gang expert to testify essentially to what's [on the gang boards] rather than have a parade of uniforms come in here one after the other." In light of that representation, the trial court informed Lopez's attorney that whether the percipient-witness officers would testify was thus "your choice." Mendez's counsel was present throughout this discussion. But he elected not to make a hearsay or confrontation clause objection.

At a subsequent hearing, Mendez's attorney went through his client's gang board with the trial court. He reiterated for the record "a general objection to the board," but then clarified that his "objection [wa]s that it's highly prejudicial" — not that the information, if admitted only through the expert, would be inadmissible hearsay. Mendez's attorney and the trial court then went through each police contact documented on Mendez's gang board one by one. The prosecutor again represented that the on-scene officers were under subpoena and available to testify. At no point did Mendez's attorney make a hearsay or confrontation clause objection.

After Mendez's attorney left the courtroom because of another obligation, Lopez's attorney informed the trial court he would stipulate to foundation and allow Underhill to testify about his client's prior police contacts. Lopez's attorney agreed that having the expert testify about the contents of the board "would avoid having the [on-scene officer] come forward and bring in some more juicy details like they always do." The trial court described that as a "tactical reason" for not persisting in making a hearsay objection.

Later in the proceedings, the trial court noted that it had "allowed hearsay" and "[n]obody has objected to anything on the [gang] boards." Mendez's attorney was present for that remark but did not challenge the trial court's assertion. Nor did he attempt to lodge a hearsay or confrontation clause objection.

So even though we did not decide *Sanchez* until well after Mendez's trial, the trial court made clear it would sustain a hearsay objection to Underhill's testimony about Mendez and his codefendants' prior police contacts. And the prosecutor represented that, if such an objection were made, the officers with firsthand knowledge of those contacts were available to take the stand. That matters. Those officers could (at the very least) have testified as percipient witnesses to their own observations and relayed to the jury Mendez's own out-of-court admissions. (See Evid. Code, § 702 [allowing lay witnesses to testify only to matters about which they have personal knowledge]; *id.*, § 1220 [allowing out-of-court admissions by an opposing party to be admitted for their truth].) But as the trial court itself noted, insisting on testimony from the on-scene officers risked intensifying the focus on these encounters and eliciting more damaging details about them.

Instead, Mendez chose to let Underhill testify to hearsay accounts of his prior police contacts. In doing so, Mendez agreed to let Underhill testify not just to facts regarding the circumstances of those contacts, but also to the fact that Mendez's companions during several of those encounters were fellow North Side Colton members. It's unclear on this record what options the People had available to establish the gang membership of Mendez's companions. It's at least possible the People could have established this fact based on what the on-scene officers themselves observed or what Mendez himself

said (or some other admissible evidence), rather than by relying on what Mendez's companions may have said out of court (statements which themselves could potentially have been admissible under an exception to the hearsay rule and consistent with the confrontation clause). But ultimately, what makes the record inscrutable on this issue is that Mendez assented to having Underhill testify that Mendez's companions were North Side Colton members. (See *People v. Romero and Self* (2015) 62 Cal.4th 1, 24 (*Romero and Self*) [observing that contemporaneous objections enable trial courts to create a record for appeal and correct errors in the first instance]; *People v. Trujillo* (2015) 60 Cal.4th 850, 857 [similar].) So we cannot fault the trial court for permitting Underhill's testimony about Mendez's police contacts under the circumstances that it did.

We reiterate that our analysis of Mendez's claim of *Sanchez* error is grounded in the unique facts of this case: the trial court expressly indicated that it would sustain a hearsay objection, and the prosecutor expressly represented that the on-scene officers were available to testify — yet Mendez chose to let Underhill testify about Mendez's prior police contacts. In another case pending before us, we granted review to decide whether a defendant's failure to object at trial before we decided *Sanchez* forfeits a claim of *Sanchez* error subsequently advanced on appeal. (See *People v. Perez,* review granted July 18, 2018, S248730.) We express no view on that question as presented on the facts of *Perez.*

### 3. Analysis of the Gang Expert's Testimony About Two Other Gang-related Shootings

Mendez also maintains that Underhill's testimony about the killings of Cindy Rodriguez and Jesse Garcia was inadmissible. We decline to address the merits of those

arguments, for any error in allowing Underhill to testify about those killings was harmless under any standard.

Underhill's testimony describing Cindy Rodriguez's murder at the hands of West Side Verdugo members could only have helped Mendez. Cindy Rodriguez was, after all, the mother of his codefendant, Joe Rodriguez. So that portion of Underhill's testimony suggested Rodriguez, not Mendez, had the more powerful motive to shoot Faria for having claimed allegiance to West Side Verdugo. Which is precisely what Mendez urged in his closing argument at the guilt phase. And even though the jury found true the allegation that Mendez pulled the trigger in the Faria killing, Underhill's testimony about Cindy Rodriguez's murder left room for lingering doubt that could only have helped Mendez's case at the penalty phase.

We also do not see how Underhill's testimony describing the killing of Mendez's fellow North Side Colton member Jesse Garcia — and Mendez's attendance at his funeral — could have affected the verdicts at either phase of the trial. True: Underhill opined that Mendez attended Garcia's funeral with North Side Colton members, suggesting that Mendez too was a gang member. But Mendez stipulated that he and his codefendants "are, *and were* at all relevant times," gang members. Also true: Underhill's testimony about Garcia's murder provided an example explaining the bitter rivalry between North Side Colton and West Side Verdugo. But even assuming, without deciding, that the Garcia example was improper, Underhill could still testify in general terms about the bitter rivalry between those two gangs based on his "background information and knowledge in the area" of local gangs. (*Sanchez, supra*, 63 Cal.4th at p. 685.) That's what made him a gang expert in the first place. (See *ibid.*)

Furthermore, Underhill properly offered an expert opinion about the gang implications of the back-and-forth involving Faria based on Lizarraga's testimony; case-specific gang evidence was first "admitted through an appropriate witness" (Lizarraga), and then an expert (Underhill) "assume[d] its truth in a properly worded hypothetical question in the traditional manner." (*Sanchez*, *supra*, 63 Cal.4th at p. 684; see also *People v. Vang* (2011) 52 Cal.4th 1038, 1048 [observing that gang experts may, "based on hypothetical questions that track[]" the evidence, offer an opinion on whether a crime, if committed by the defendant, was done "for a gang purpose"].) *That* testimony about what happened in the moments before Faria's murder — not testimony about Garcia's murder six years earlier — was what the People urged was critical for the jury to understand at the guilt phase.

As to the penalty phase, we are confident the jury would have returned the same verdict against someone it convicted of twice taking a life even if it hadn't been told that, years earlier, he once attended a funeral. In some ways, in fact, Garcia's murder at the hands of a rival gang aided Mendez's attempt to mitigate his culpability by painting a picture for the jury of his gang- and violence-infested surroundings. That the trial court admitted a photograph of Garcia lying in an open casket (without any visible wounds) does not alter our conclusion.

## B. Mendez's Jailhouse Conversation with Bakotich

Mendez argues that two portions of a jailhouse conversation he had with a friend — Nicole Bakotich — should have been excluded. First, Mendez asserts that unlawful police interrogations tainted a statement he later made to Bakotich admitting to being near Salazar when she was killed. Second,

Mendez maintains that letting the jury hear him repeat to Bakotich incriminating statements made by Rodriguez violated his Sixth Amendment right to confront witnesses against him. Neither argument is persuasive. Here too we begin with the relevant facts and then analyze Mendez's contentions in turn.

### 1. Facts

After his arrest, Mendez was questioned by Detective Christopher Brown on February 24, 2000. Brown advised Mendez of his *Miranda* rights, which Mendez agreed to waive. Questioning proceeded from there. Mendez denied being a gang member and denied knowing anything about "a shooting over at the Luna house." But later on, after Brown accused Mendez of "not telling . . . the truth on a lot of things," Mendez said, "I'll just have my attorney present sir." Brown nevertheless persisted with questioning, telling Mendez, "I know you know more tha[n] what you read in the paper." Mendez relented and admitted hearing that "some guys" had "rolled up" on a boy and killed him because "they thought that he was somebody else or something." They took a short break, then Mendez said that he couldn't talk more because he was "not even thinking straight" and was "tired." The interrogation ended shortly afterwards.

On April 8, 2000 — about six weeks later — Mendez was interrogated about the murders again, this time by Sheriff's Investigator John Del Valle. The interrogation started just after 8:00 p.m. Del Valle advised Mendez of his *Miranda* rights, and Mendez agreed to waive his rights and talk. Del Valle then explained that his investigation had uncovered witnesses and physical evidence. He showed Mendez a collection of tapes, suggesting that they were statements from other witnesses, but told Mendez that he didn't "want to put you in a position where

you wind up getting stabbed." Del Valle appeared to dangle those tapes as something that Mendez was "not supposed to see," perhaps because of the risk of retaliation. Del Valle also said he had "talked to everyone" involved other than Mendez. Del Valle told Mendez the tires on Redmond's truck belonged to the Isuzu Rodeo Mendez had been driving when he was arrested. Furthermore, Del Valle played tapes of multiple witnesses. He stressed that they had identified Mendez as having personally pulled the trigger, at least for the Salazar murder. He also asked Mendez, "What is the most a person can get for two shootings" — to which Mendez responded, "The death penalty."

Mendez repeatedly denied shooting Salazar. But a few minutes after 11:00 p.m., he admitted to being just feet away from Salazar when she was killed. Moments before that admission, however, Mendez said, "If I had an attorney right here right now I would answer your question." And two hours earlier, Mendez had said, "I think I should do this with an attorney" — but Del Valle had pressed on, responding, "Well, hold on, hold on, hold on . . . do you wanna listen to [a tape] right now?" and then playing a tape of another witness. Still, Mendez agreed that Del Valle had not yelled at, disrespected, or been mean to him. Del Valle also allowed Mendez to use the restroom during the interrogation and offered him food.

The next morning, Bakotich visited Mendez in jail. They talked, and their conversation was recorded. Mendez explained the gravity of his situation. He told Bakotich, "I got a little bit of [a] chance if they can prove I didn't kill [Salazar]," which might "get it down from the death penalty." But Mendez was worried about the tapes the police had shown him. He said, "They showed me videotapes of [Redmond], then they showed a

fuckin' tape of [Rodriguez]" saying "[h]e heard shots" and saw "me standing over" Faria. Redmond, Mendez went on, "said that I grabbed [Salazar] and that I put the gun to her head and snuffed her." Mendez said, "I got myself into this trouble."

Mendez next told Bakotich, "I didn't do the shooting." "[W]e all know [Redmond] did 'em," he continued, so "I told [Luna] to tell the guys, just [f]uck it, say Sam did it." Bakotich asked if the police had "a weapon or anything." Mendez responded, "No, but they don't need it" because they "got guys saying that I was there and I was the shooter." Bakotich tried to reassure Mendez with an anecdote about someone who escaped conviction because the police never recovered a murder weapon.

Mendez recounted admitting to Del Valle that he was standing six feet away from Salazar when she was killed. Mendez then told Bakotich, "If I could get out of [the Salazar murder] I can probably get . . . self-defense on [the Faria shooting] because they fuckin' started it." He added that the Faria murder happened "in front of [Art Luna's] house" and confirmed that he was "going to try self-defense" on that charge. But Mendez reiterated, "I didn't kill the girl, fuck."

Later on, Mendez remarked to Bakotich, "If they would have kept their mouths shut . . . [f]uckin' everything would have been cool and shit" but "they are fuckin' saying that I was the fuckin' shooter." He recapped being shown a tape of Redmond's reenactment of the Salazar murder. Mendez explained that Del Valle had said he had "another one of Joe Rodriguez" and that Rodriguez reenacted the Faria murder. Mendez then described for Bakotich the subsequent back-and-forth between him and Del Valle: "He's all but there was a confrontation that made you

guys, you kill this guy," and "I'm like I didn't kill [Faria]." Finally, Mendez told Bakotich they should "[g]o with the truth," which was "[t]hat Sam [Redmond] did it."

Once the case was underway, Mendez moved to exclude his statements made during the second interrogation, claiming that he repeatedly invoked his right to counsel during both interrogations but was repeatedly ignored in violation the protections afforded by *Miranda v. Arizona* (1966) 384 U.S. 436 and *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*). The People were concerned enough about the *Miranda/Edwards* issue to agree, "as a tactical consideration," not to introduce in its case-in-chief anything Mendez said during either interrogation. The prosecution did, however, seek to introduce the recording of Mendez's conversation with Bakotich. The trial court admitted the recording over Mendez's objection.

### 2. *Analysis of Statement Recounting Admission About Salazar Murder*

The trial court did not err in admitting Mendez's statement to Bakotich about being six feet away from Salazar when she was killed. This statement was admissible notwithstanding the alleged problems with the custodial interrogations that preceded it.

The due process clause of the Fourteenth Amendment to the United States Constitution bars the admission of "any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion." (*People v. Neal* (2003) 31 Cal.4th 63, 79 (*Neal*).) So when the police obtain a suspect's statements "by 'techniques and methods offensive to due process' . . . or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will,' "

the statements are inadmissible. (*Oregon v. Elstad* (1985) 470 U.S. 298, 304 (*Elstad*), citation omitted, quoting *Haynes v. Washington* (1963) 373 U.S. 503, 514.)

In *Miranda,* the U.S. Supreme Court went further. It adopted prophylactic protections that "required suppression of many statements that would have been admissible under traditional due process analysis by presuming that statements made while in custody and without adequate warnings were protected by the Fifth Amendment." (*Elstad, supra,* 470 U.S. at p. 304.) Among these protections is a suspect's right under *Edwards* to terminate questioning by "express[ing] his desire to deal with the police only through counsel" and to be left alone thereafter until an attorney is present or he reinitiates questioning on his own accord. (*Edwards, supra,* 451 U.S. at p. 484.) Mendez asserts the trial court should have excluded his statement during the second interrogation that he was just feet away from Salazar when she was killed because it was "involuntary" and, at the very least, obtained in violation of the *Edwards* prophylactic rule. That being so, Mendez argues that his statements to Bakotich parroting that admission were fruits of the poisonous tree.

Mendez's argument hinges on the allegedly unlawful nature of his second interrogation — so that's where we begin. We assume, but need not decide, that the police obtained Mendez's "six feet away" statement during his second interrogation by violating the *Edwards* rule. But we conclude the statement was nonetheless voluntary. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1039 [observing that "continued interrogation after a defendant has invoked his right to counsel, or an *Edwards* violation," does not "inherently constitute coercion"].)

23

Our voluntariness determination rests on an "independent" consideration of the entire record, including " 'the characteristics of the accused and the details of the [encounter].' " (*Neal, supra,* 31 Cal.4th at p. 80, quoting *People v. Benson* (1990) 52 Cal.3d 754, 779.) Mendez was 21 years old at the time of the interrogation and had experience with the criminal justice system. It was not his first police interrogation. And although Mendez's education level was not high, he has not argued he was intellectually disabled or of low intelligence. As for the interrogation itself, it started just after 8:00 p.m. and concluded shortly after 11:00 p.m. During that period, Mendez was allowed to use the restroom and offered food. He also said himself that Del Valle had not yelled at, disrespected, or been mean to him. And contrary to Mendez's assertions, Del Valle did not threaten him. Yes, Del Valle suggested there was a risk that Mendez might be retaliated against in prison — especially if he saw tapes of statements of others cooperating with police. But Del Valle did not threaten to exacerbate that risk if Mendez didn't talk or suggest that talking was the only way to avoid it. And yes, Del Valle asked Mendez to consider the possible punishment he could face — to which Mendez responded, "The death penalty." But Del Valle left it at that, and we have already held that a comparable back-and-forth is not an unlawful threat. (See *People v. Thompson* (1990) 50 Cal.3d 134, 169-170.) So even assuming there was an *Edwards* violation here, the totality of the circumstances does not suggest that Mendez's "free will was overborne by state compulsion." (*People v. Storm* (2002) 28 Cal.4th 1007, 1035 (*Storm*) [holding similarly].)

This analysis fits our decision in *Neal.* The record in that case — "from beginning to end" — showed the defendant's intelligence "was quite low." (*Neal, supra,* 31 Cal.4th at p. 84.)

His experience with the criminal justice system was also "hardly extensive." (*Ibid.*) What makes *Neal* even more obviously distinguishable, though, are the circumstances surrounding the interrogation in that case. The defendant in *Neal* was interrogated once, then "placed in a cell without a toilet or a sink" without being "taken to a bathroom or given any water until the next morning." (*Ibid.*) Before getting any food, he was interrogated again, and then a third time. (*Ibid.*) He was confined in isolation for 24 hours. (*Ibid.*) The interrogating officer also made clear that the defendant was at his mercy, with little choice but to talk. The officer instructed the defendant to "make believe that I am driving the bus and you want to get off the bus" and that the officer could either drop the defendant "closer to home" or take him "all the way to Timbuktu." (*Id.* at p. 81.) The officer later made the threat explicit, saying, "[I]f you don't try and cooperate," then "the system is going to stick it to you as hard as they can." (*Ibid.*) The *Edwards* violation in *Neal* was also particularly severe. There, the defendant did not initially waive his *Miranda* rights and later invoked his right to counsel *nine* times. (*Neal*, at p. 78.) So despite acknowledging there was no physical coercion in *Neal*, we said the interrogation's "harshness cannot be ignored." (*Id.*, at p. 84.) The same cannot be said of the interrogation at issue here.

So we are unpersuaded by Mendez's claim of error. At worst, what we have before us is a statement obtained during interrogation in violation of *Edwards* but " 'unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will.' " (*Storm*, *supra*, 28 Cal.4th at p. 1033, quoting *Elstad*, *supra*, 470 U.S. at p. 309.) The admissibility of Mendez's subsequent statement to Bakotich thus turns solely on whether that

subsequent statement "was itself voluntary and obtained without a *Miranda* violation." (*Storm,* at p. 1030.)

It was. Mendez does not suggest he should have received a *Miranda* warning before talking to Bakotich, and such an argument would be meritless at any rate. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1401-1402 [holding that jailhouse conversations with visitors do not constitute interrogation and thus do not require *Miranda* warnings].) Nor does Mendez assert that he was compelled to talk to Bakotich — only that his conversation with her "came fast on the heels" of his interrogation the night before and was thus "the indirect product or fruit thereof." But because we have already concluded that Mendez's statement during the interrogation was voluntary, it follows a fortiori that his statement to Bakotich was too: something "cannot be 'fruit of the poisonous tree' if the tree itself is not poisonous." (*Colorado v. Spring* (1987) 479 U.S. 564, 571-572.) The trial court therefore did not err in admitting Mendez's statement to Bakotich about being six feet away from Salazar when she was killed.

### 3. Analysis of Statement Recounting Rodriguez's Accusations

Nor did the trial court err in admitting Mendez's statements to Bakotich about being told by the police that Rodriguez had accused him of shooting Faria. Mendez argues that doing so violated his Sixth Amendment right to confront witnesses against him, as Rodriguez did not testify at trial and thus was not subject to cross-examination. But because a reasonable jury could conclude that Mendez adopted Rodriguez's statements as his own, there was no confrontation clause violation here. (See, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 660-661 (*Jennings*).)

The confrontation clause of the Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." (U.S. Const., 6th Amend.) As the U.S. Supreme Court recognized in *Bruton v. United States* (1968) 391 U.S. 123, and as we recognized in *People v. Aranda* (1965) 63 Cal.2d 518, admitting in a joint trial out-of-court statements made by a nontestifying codefendant that incriminate the defendant poses a severe "hazard" to the defendant's confrontation rights. (*Bruton*, at p. 137.) For that reason, courts "cannot accept limiting instructions as an adequate substitute for [the] constitutional right of cross-examination." (*Ibid.*)

But we have also held that incriminating statements made by another become the defendant's " 'own admissions' " when the defendant has "expressly or impliedly adopted" them. (*Jennings*, *supra*, 50 Cal.4th at p. 661, quoting *People v. Cruz* (2008) 44 Cal.4th 636, 672.) The witness against the defendant in those circumstances is " 'the defendant himself, not the actual declarant,' " so there is no confrontation clause problem. (*Jennings*, at p. 662, quoting *United States v. Allen* (7th Cir. 1993) 10 F.3d 405, 413.) Evidence Code section 1221 sets forth the standard for adoptive admissions: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

For the defendant to have adopted the statement of a codefendant, two things must be true. (*People v. Combs* (2004) 34 Cal.4th 821, 843.) First, the defendant must know the content of the codefendant's hearsay statement. (*Ibid.*) Second,

the defendant must suggest in some way that he believes the codefendant's statement to be true. (*Ibid.*) Whether the defendant actually adopted the statements of the codefendant, however, is a question for the jury. (*People v. Riel* (2000) 22 Cal.4th 1153, 1189-1190.) A court thus decides only whether a reasonable jury could so conclude on the facts before it. (*Id.* at p. 1189; see also *People v. Davis* (2005) 36 Cal.4th 510, 535 [observing that the court's decision turns on "whether there is evidence sufficient to sustain a finding that" the defendant adopted the statement].)

People do not admit everything they merely recount to someone else. (See *People v. Hayes* (1999) 21 Cal.4th 1211, 1258.) But here a reasonable jury could have concluded that Mendez indeed adopted — rather than just recounted — Rodriguez's statements naming Mendez as the person who shot Faria. Consider how Mendez responded to Rodriguez's accusation that he shot Faria compared to Redmond's accusation that he shot Salazar. Mendez told Bakotich he was "going to try self-defense" with respect to the Faria shooting "because they fuckin' started it," arguably admitting he pulled the trigger. Yet in the same breath Mendez categorically denied shooting Salazar: he declared to Bakotich, "I didn't kill the girl, fuck." A reasonable jury could take that exchange as showing that Mendez, while denying Redmond's accusation as to the Salazar murder, adopted Rodriguez's accusation as to the Faria murder.[2]

---

[2] Mendez does not challenge on confrontation clause grounds the trial court's decision to admit his recounting of Redmond's accusations to Bakotich. Nor could he, as Redmond was subject to cross-examination at trial.

That is enough. To the extent Mendez might have denied shooting Faria at other points in his conversation with Bakotich, even "contradictory statements" are admissible under the adoptive admission rule. (*People v. Richardson* (2008) 43 Cal.4th 959, 1020; see also *People v. Whitehorn* (1963) 60 Cal.2d 256, 262 [holding that "if a denial is coupled with other conduct of the accused which is of evidentiary importance, such as where false and evasive replies are made together with a denial, the evidence may be received"].) So the trial court did not err by admitting portions of the Bakotich conversation where Mendez recounted Rodriguez's accusation.

Nor can we fault the trial court for giving the standard instruction on admissions in general (CALJIC No. 2.71) but not the standard instruction on adoptive admissions in particular (CALJIC No. 2.71.5). There is no sua sponte duty to give the latter instruction. (See *People v. Carter*, *supra*, 30 Cal.4th at p. 1198.) And especially when paired with the trial court's oral admonition that the Bakotich conversation was "only to be considered" with respect to Mendez's "state of mind or to the extent he adopts these things," the standard written instruction given at trial was sufficient for the jury to understand its role.

## C. Sufficiency of the Evidence as to the Faria Murder

Contrary to Mendez's contentions, there was sufficient evidence to support a finding that Mendez shot Faria — the conduct supporting Mendez's conviction for that murder, as well as the multiple-murder special circumstance and the firearms enhancements. When we assess the sufficiency of the evidence, we must view "the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced

from the evidence" to see if "a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)

A reasonable jury could find that Mendez adopted by implication Rodriguez's accusation that he shot Faria, and for present purposes we must presume the jury so found. From there, we have little trouble concluding there was sufficient evidence to support a finding that Mendez shot Faria. Mendez's adopted admission, though powerful in its own right, was not the only evidence from which a reasonable jury could infer that he shot Faria. Redmond testified he saw Mendez running with a gun in his hand mere moments after Faria was shot. Redmond further testified that Mendez instructed Rodriguez to grab Salazar and that Mendez later said, "She's gotta die" — suggesting he was determined to cover up evidence of the Faria murder to save his own skin. Nothing more is required. In this posture, we may " 'resolve neither credibility issues nor evidentiary conflicts.' " (*Zamudio, supra*, 43 Cal.4th at p. 357, quoting *People v. Maury* (2003) 30 Cal.4th 342, 403.) So it makes no difference that Redmond arguably had credibility problems or that Lizarraga originally identified Rodriguez as the person who shot Faria.

## D. Cross-examination of Redmond

Mendez also maintains the trial court should have permitted Redmond to be cross-examined about: (1) whether he told the prosecution that its exhibit listing him as a gang member was inaccurate, and (2) whether his final meeting with law enforcement before pleading guilty was "sheer coincidence." But because the trial court had "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits"

on questioning, and because Mendez has not shown that either prohibited question would have left the jury with "a significantly different impression of [Redmond]'s credibility," the trial court did not abuse its discretion in limiting the cross-examination of Redmond. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679-680 (*Van Arsdall*); see also *People v. Pearson* (2013) 56 Cal.4th 393, 455-456 (*Pearson*) [reviewing for abuse of discretion]; *People v. Chatman* (2006) 38 Cal.4th 344, 372-374 [same].)

### 1. *Questioning Redmond About His Reaction to the People's Gang Exhibit*

The trial court did not abuse its discretion in prohibiting questioning about whether Redmond told the prosecution that its exhibit was mistaken to list him as a gang member. Such questioning would have injected an issue that risked taking up considerable time and confusing the jury — and which possessed little probative value.

During their opening statement, the People told the jury that it would "hear the testimony of Sam Redmond," a man "with the moniker or gang name of Devil." Fitting with that description, a prosecution exhibit listed Redmond as a gang member. That exhibit was displayed behind Redmond during his testimony. Redmond denied being a gang member at trial.

During cross-examination, an attorney for Mendez's codefendant, Rodriguez, asked Redmond when he first saw the People's exhibit listing him as a gang member. Redmond said he first saw it on the "first day" of his trial testimony. Rodriguez's attorney then asked Redmond, "Did you tell the district attorney the information under your name was incorrect?" The People objected, and the trial court sustained the objection under Evidence Code section 352.

Outside the presence of the jury, the trial court discussed the matter further with the parties. It said to Rodriguez's attorney, "I'm sure you were going to ask him as to when you saw the information on that diagram why didn't you bring it to the attention of the district attorney," then asked for confirmation if that was true. Rodriguez's counsel responded, "I'm not going to ask him why, I'm going to ask him if he did." At that point, the trial court explained why it didn't allow the question, saying that "under Evidence Code [s]ection 352 if he did or if he didn't, I think it's so equivocal and has little probative value." "Whether [Redmond] told the district attorney" that the exhibit was incorrect, the trial court continued, "add[ed] little" to other available avenues of impeaching Redmond's denial of being a gang member. Furthermore, the trial court said that it wanted to avoid a "long philosophical discussion" as to what would be expected of Redmond under the circumstances.

Even if we assume that Mendez preserved this claim of error and that he may object to limitations on cross-examination conducted by someone other than his own attorney, the trial court did not abuse its discretion. Evidence Code section 352 grants a trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We have recognized, moreover, that excluding " 'evidence of marginal impeachment value' " under Evidence Code section 352 " 'generally does not contravene a defendant's constitutional right[] to confrontation.' " (*Pearson, supra*, 56 Cal.4th at p. 455, quoting *People v. Brown* (2003) 31 Cal.4th 518, 545.)

This case is no exception. Getting into whether Redmond impliedly adopted the exhibit's representation that he was a gang member would have risked wasting time and creating confusion — all without much benefit. Such questioning would have raised the vexing question whether Redmond manifested a belief in the truth of the exhibit by not immediately pointing out its inaccuracies while on the stand. (See Evid. Code, § 1221.) That, in turn, would have required time-consuming litigation about the precise circumstances under which Redmond first saw the exhibit, whether those circumstances afforded him a way of communicating with the prosecution, whether doing so would have been practical under the circumstances, and so on.

And for what? Not much. As the trial court noted, there were more effective, less problematic ways to impeach Redmond's denial of being a gang member. For example, Redmond asserted on cross-examination that he could "step in and out of [the gang] lifestyle" and freely associate with numerous gang members while "stay[ing] above involvement in the gangs" — even though he admitted living with North Side Colton members, frequently driving North Side Colton members around, storing guns in a safe only he and an admitted North Side Colton member (Mendez) could unlock, and being arrested with North Side Colton members while in possession of a gun. Redmond also claimed that he adopted the gang moniker "Devil" six months after his late March 2000 arrest in this case, but that he got a tattoo of a devil embracing a young girl before the Salazar killing. He stood by that story despite documentation from an earlier unrelated arrest on February 20, 2000 that cast doubt on it. That documentation indicated that Redmond's gang moniker was "Devil" and that he had a clown tattoo on one leg — but did not mention a devil tattoo on his other leg. Then, of

course, there is the reality that *the People's own exhibit* listed Redmond as a gang member.

So even assuming Redmond had a reasonable opportunity to inform the prosecution that its exhibit was wrong at the start of his testimony, it's highly unlikely this would have made any difference. The mere fact he did not do so before expressly denying gang membership throughout his testimony would have had little impeachment value beyond that available through other lines of questioning. Accordingly, the question was permissibly barred under Evidence Code section 352 — and prohibiting it did not produce "a significantly different impression of [Redmond]'s credibility" in violation of the Confrontation Clause. (*Van Arsdall, supra*, 475 U.S. at p. 680; see also *Pearson, supra*, 56 Cal.4th at pp. 455-456.)

### 2. *Questioning Redmond About His Final Meeting with Law Enforcement Before Cooperating*

The trial court did not violate the confrontation clause by preventing Mendez's attorney from asking Redmond whether it was "sheer coincidence" that he met with law enforcement just before signing his plea agreement.

To escape the death penalty, Redmond pleaded guilty on August 29, 2003, pursuant to a cooperation agreement with the People. That agreement provided in all caps that Redmond's "MOST IMPORTANT OBLIGATION IS TO TELL THE TRUTH AND TELL ONLY THE TRUTH." A week or two before signing the agreement, Redmond took a polygraph test during which he denied shooting anyone. Redmond passed the polygraph test, and the People cut him a deal.

Evidence Code section 351.1 provides in relevant part: "Notwithstanding any other provision of law, the results of a

polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . ." During proceedings outside the presence of the jury, the People acknowledged that, under this provision, it "obviously [could not] refer to [Redmond] offering to take a poly[graph] or [make] any mention at all of a poly[graph]." To ensure defense counsel could still cross-examine Redmond about his final meeting with law enforcement before signing his plea agreement, the People suggested the parties refer to that final pre-plea meeting as simply "the DOJ [Department of Justice] interview." The People also admonished Redmond not to mention his polygraph examination. Mendez's attorney agreed with those measures.

At trial, Mendez's attorney cross-examined Redmond about whether his plea agreement was conditioned on his not being the shooter, or merely his telling the truth at trial. Redmond first agreed that his plea agreement required that he was "not a shooter" but moments later agreed that his plea agreement required that he merely "tell the truth." And just after that, Redmond agreed that he would get his deal, so long as he was "not a killer." Then, after consulting with his attorney, Redmond said that he "had to tell the truth in order to get all the benefits" of cooperating.

The next day, Mendez's attorney picked up the same line of questioning during a second round of cross-examination. The attorney elicited that the prosecution talked to Redmond after his earlier testimony and told him that the deal was contingent only on his telling the truth. Redmond confirmed that he understood his plea agreement to require only that he tell the truth at trial. Mendez's attorney responded by confronting

Redmond with the portions of his earlier testimony where Redmond agreed that his deal hinged "on the fact the [he was] not a shooter or a killer." Redmond claimed he had been confused.

Questioning turned to the meetings Redmond had with law enforcement before signing his plea agreement. Redmond confirmed that, during the first meeting on February 20, 2000, he "lied about having any knowledge about the killings of Mr. Faria and Ms. Salazar." Redmond then confirmed that, at the second meeting about a month later, he initially lied again but ultimately came clean. At that point, Redmond continued, he was charged with murder.

Mendez's attorney also elicited that, three years later, Redmond had a fourth meeting with law enforcement: the DOJ interview. Redmond confirmed that he signed his plea agreement "about a week or two" after the DOJ interview. Mendez's attorney asked Redmond if it "was just a sheer coincidence that [he] had another interview a week and a half before [he] signed [his] plea agreement?" The People objected, and the trial court called for a sidebar.

Outside the presence of the jury, the trial court remarked that if Mendez was "going to suggest" that the DOJ interview was "a coincidence," then the prosecution "could bring out" the reason for that meeting: that Redmond's deal "was conditioned upon him passing a polygraph." Mendez's attorney responded, "I will abandon those questions if that's how the Court feels." After further discussion, the trial court suggested a line of questioning to which Mendez's attorney agreed. Specifically, after the jury returned, Mendez's attorney asked Redmond whether he was "given a deal based on [his] version of the events

that [he was] not a shooter and [he was] not a killer." Redmond answered, "Yes." Mendez's counsel next asked if the People had "accepted [that] version of things as being the truth" such that, if Redmond testified at trial, "I'm the shooter," the People would have "problems with that." Redmond agreed with that description of his situation.

On appeal, Mendez argues that the trial court's "polygraph threat" curtailed his ability to cross-examine Redmond in violation of his confrontation rights. No such violation occurred.

Mendez represents on appeal that the disputed line of questioning was meant to establish that "Redmond told authorities during 'the DOJ interview' exactly what they wanted to hear" and that under his plea agreement Redmond "was not free to testify [at trial] that he had murdered Salazar even if" that was true. Mendez got what he sought. The alternative line of questioning allowed by the trial court established as much: Redmond confirmed that he was "given a deal based on [his] version of the events that [he was] not a shooter" and that the People had "accepted [that] version of things as being the truth." Redmond further confirmed that, if he changed his story and admitting to being a shooter at trial, the People would have "problems with that." Redmond was boxed in, and the jury knew it. So this prohibited cross-examination would not have produced "a significantly different impression of [Redmond]'s credibility" in violation of the confrontation clause. (*Van Arsdall*, *supra*, 475 U.S. at p. 680; see also *Pearson*, *supra*, 56 Cal.4th at pp. 455-456.)

### E.  Photograph Depicting Faria's Body

Mendez challenges the trial court's decision to admit a photograph depicting Faria's body just before an autopsy was conducted.  Such a photograph may be admitted if:  (1) the photograph is relevant, and (2) its probative valued is not substantially outweighed by the risk of unfair prejudice.  (See *People v. Ramirez* (2006) 39 Cal.4th 398, 453 (*Ramirez*); see also Evid. Code, §§ 350, 352.)  We review the trial court's determination of each issue for abuse of discretion.  (*People v. Scheid* (1997) 16 Cal.4th 1, 14, 18; accord *People v. Mills* (2010) 48 Cal.4th 158, 191.)  We see no abuse in this case.

Outside the presence of the jury, the trial court discussed with the parties whether to admit two photographs of Faria's body — what became People's exhibits 42 and 45.  Mendez and his codefendants originally objected to both photographs but, after the People agreed to crop exhibit 45 to allay the codefendants' concerns about that photograph, persisted only in objecting to exhibit 42.  The trial court overruled that objection, reasoning that exhibit 42 "would be helpful to the pathologist" who performed the autopsy in explaining to the jury "what he was provided with," "how he examined the body," and the fact "that he found other injuries [on Faria's body] as well, but they were not all involved with the bullets that killed [him]."  The trial court also noted that the photograph was not "all that prejudicial" compared to photographs it had seen in other cases.  In short, the trial court concluded that exhibit 42 was relevant and that its probative value was not substantially outweighed by the risk of unfair prejudice.

On appeal, Mendez argues the trial court was wrong on both fronts and thus should have excluded exhibit 42.  We

disagree. First, as to relevance, photographs like this one are relevant if they help clarify testimony from a medical examiner. (*Ramirez, supra*, 39 Cal.4th at p. 454; see also *People v. Thomas* (1992) 2 Cal.4th 489, 524 [collecting cases].) That is what the trial court concluded here, and we see no error in that determination. Second, as to whether exhibit 42's probative value was substantially outweighed by the risk of unfair prejudice, even "gruesome" and "disturbing" photographs may be admitted if they do not "sensationalize an alleged crime" and are not "*unnecessarily* gruesome." (*Ramirez*, at p. 454, italics added.) Plus, if the record demonstrates the trial court was "aware of [its] duty to weigh the prejudicial effect of the photographs against their probative value" and performed that duty "carefully," that too weighs against finding an abuse of discretion. (*Ibid.*)

We have examined exhibit 42 and conclude that it neither sensationalizes Faria's killing nor contains unnecessary gore. The photograph depicts Faria's body lying on a table with his abdomen cut open, but — as the jury was told — that was the result of surgery performed to save Faria's life, not shots fired to end it. We have seen, and approved the admission of, far worse. (See, e.g., *Ramirez, supra*, 39 Cal.4th at pp. 409, 454. [affirming admission of photograph depicting a murder victim with her eyes cut out not by medical personnel, but by the murderer].) Furthermore, the record demonstrates that the trial court carefully exercised its duty to weigh the probative value of potentially inflammatory photographs against the risk of unfair prejudice. The trial court heard the parties' arguments on that issue at some length, explained its ruling on the record, and — with respect to exhibit 45 — guided the parties towards a compromise to minimize the risk of unfair prejudice.

Accordingly, the trial court did not abuse its discretion in admitting exhibit 42.

## F. References to "Guilt/Innocence" Dichotomy

Mendez asserts the trial court prejudicially erred by giving the jury two instructions using the word "innocent" rather than "not guilty." These instructions and several similarly phrased comments made by the trial court during voir dire, Mendez argues, created a "guilt/innocence" dichotomy impermissibly diluting the reasonable doubt standard. Yet Mendez concedes we have consistently rejected arguments just like the one he advances here. (See, e.g., *People v. Nelson* (2016) 1 Cal.5th 513, 554; *People v. Brasure* (2008) 42 Cal.4th 1037, 1059 (*Brasure*); *People v. Crew* (2003) 31 Cal.4th 822, 847-848.) He offers us no persuasive reason to depart from those decisions, and we decline to reconsider them.

## G. Victim Impact Evidence

Contrary to Mendez's contentions, the victim impact evidence admitted in this case was within the bounds of what our precedents permit.

### 1. Facts

The People called six witnesses to offer victim impact testimony at the penalty phase of Mendez's trial, three for Faria and three for Salazar.

Faria's father testified first. He told the jury that Faria "cared about other people, cared about his mom, cared about his sisters and brother, cared about me." Faria's father also said it was a "shock" to hear that his son had claimed allegiance to a gang, explaining that Faria "never gave us any clue or any kind of thought that he was going to be a gang member." Faria's father also described his experience on the night of his son's

killing.  He told the jury how Faria said, "I love you" on his way out the door, which was "the one time" Faria's father could remember his son doing that — and also "the last time."  Upon hearing his son had been shot, Faria's father rushed to the hospital.  Despite initially hoping "the bullet in [Faria's] brain would be able to be removed," the hospital staff eventually concluded that it was "too swelled up" and that Faria was "not going to make it."  Faria's dad then chronicled the toll his son's death had on their family:  he and his wife divorced but they and their children were "surviving."  The emotional impact was especially severe, Faria's father continued, because his son died a "tragic, sickening, evil, disgusting death."

Faria's sister testified next.  She was 13 years old when she took the stand.  She described to the jury how Faria would "protect [her] from boys" at school and, on one occasion, saved her life by pulling her from a burning car.  She also detailed her experience on the night Faria was shot.  After rushing to the hospital with family members, she saw her brother "lying on [a] bed all bloody."  When he passed away, she was "[s]cared, crying, hurt."  At the close of her testimony, the People asked Faria's sister to describe childhood photographs of her, Faria, and their other sister.  These and other childhood photographs of the victims were shown to the jury throughout the penalty phase.

The People's final witness who testified about the toll of Faria's death was his mother.  She described her son as "very energetic," "very playful," and "very cheerful."  When asked where she was when she heard about the shooting, Faria's mother told the jury, "I was sleeping and I was having a nightmare . . . that I had got shot, and I s[aw] the bullet go through my face, and that startled me to wake up."  At that moment, she continued, two detectives knocked on the door and

told her Faria had been shot. The detectives searched Faria's room for evidence of gang involvement, a possibility that "shocked" Faria's mother. She then went to the hospital, where she saw her son — who had just had emergency surgery — and observed that "[a]ll his insides were out" and that "blood was dripping from the bed." At the hospital, she told her remaining children that their brother was going to die. His death took its toll on the family. Faria's mother explained that she and Faria's father divorced. Their daughter began claiming allegiance to West Side Verdugo, feeling "that if her brother died for something . . . she's going to be claiming that too." And Faria's mother herself fell into a five-month period of drug abuse.

The proceedings turned to Salazar. The first two witnesses to testify about the impact of Salazar's death were her cousins. One described Salazar as someone who "liked to make everybody laugh" and detailed the pain she felt upon hearing from a newspaper article that Salazar had been "executed" with a shot to the head. Salazar's other cousin similarly described her as someone who "always put a smile on everybody's face" and who "had the intelligence to do anything that she wanted to do," like become "a doctor" or "a lawyer." He also testified that Salazar's death created "a hole in the heart of everybody that's loved her" that "[n]othing could ever fill."

Salazar's mother was the final witness to testify at the penalty phase. She broke down shortly after taking the stand, spurring the trial court to call a brief recess. When trial resumed, the People asked Salazar's mother to read a poem Salazar had written as a fifth grader. That poem, entitled "Jessica's Cry," read as follows:

> Most of us don't want to die, but, anyway, in our
> coffin there we lie.

> You could have been stabbed, or shot, or took an
> overdose of pot.
>
> No one cares anymore; people are getting shot to
> the floor.
>
> There are screams everywhere; people are running
> here and there.
>
> There is someone on the ground; when they are
> found, everyone's crying.
>
> The truth is everyone is dying.
>
> We pray to God every night, but the next day begin
> to fight.
>
> Everyone is killing each other, not knowing all the
> pain and hurt they're going to make or all the souls
> they are going to take.
>
> I don't know about you, but I've had enough.
>
> They're taking innocent lives.
>
> It could be your brothers, your sisters, your wives,
> or maybe even you.

Once she finished reading the poem, Salazar's mother narrated the occasions on which "about eight" childhood photos of Salazar were taken. As she did so, she elaborated on how the murder had left her son's life "in shambles." Salazar's mother said her son was "not the same boy as before." He became "very angry" and even contemplated suicide, causing him to be institutionalized multiple times. After discussing the remaining childhood photographs of her deceased daughter, Salazar's mother told the jury that her "world stopped" the day her daughter was killed and that the way in which she died made the pain even more intense. The prosecution then showed portions of a home video depicting Salazar's sixth grade graduation — followed by a photo of Salazar's gravestone.

### 2. *Analysis*

Although the victim impact evidence admitted at the penalty phase of Mendez's trial was powerful, we cannot say it was improper under our precedents. Witnesses, we have said, "are permitted to share with jurors the harm that a capital crime caused in their lives." (*People v. Perez* (2018) 4 Cal.5th 421, 461-462.) That is because "the effects of a capital crime are relevant . . . as a circumstance of the crime." (*Id.* at p. 462; see also § 190.3, subd. (a).) And so long as victim impact evidence does not invite the jury to respond in a purely irrational way, it is admissible. (*Perez*, at p. 462.)

As an initial matter, the trial court did not, as Mendez contends, permit a "flood" of victim impact evidence. To the contrary, permitting victim impact testimony from six witnesses regarding two victims — that is, three per victim — is comparable to what we have permitted in other cases. (See, e.g., *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 511, citing *People v. Brady* (2010) 50 Cal.4th 547, 573 (*Brady*) [allowing victim impact testimony from three witnesses for one victim and observing that this court has in the past permitted testimony from nine such witnesses for one victim]; *People v. Simon* (2016) 1 Cal.5th 98, 140 [collecting cases].) Admitting some 13 photos of Salazar and fewer of Faria likewise was not excessive under our cases.[3] (See, e.g., *Romero and Self, supra*, 62 Cal.4th at p. 46

---

[3] We acknowledge that the photographs admitted here depicted Faria and Salazar as children. The admission of childhood photographs may be improper in some cases, particularly where they depict the victim at a substantially younger age than at the time of death. But in this case, there was no error. Faria and Salazar "were, after all, still young

[allowing admission of twelve photos of one victim]; *People v. Bramit* (2009) 46 Cal.4th 1221, 1240-1241 [allowing admission of video montage depicting approximately 20 photographs of one victim].)

What this victim impact evidence showed was also in line with what we have allowed in the past: the witnesses testified "about their relationship with" the victims, "how they learned about" the victims' deaths, and how the murders "affected their lives." (*People v. Spencer* (2018) 5 Cal.5th 642, 677.) The details of that testimony were not materially more emotionally inflammatory than that approved by our precedents. Yes, Faria's family members described rushing to the hospital and seeing him lying there, bleeding and dying. But in *Brady* we permitted fellow police officers to "testif[y] extensively about how they learned of the shooting, their initial reactions to learning that the downed officer was their friend," and "the efforts to save his life both at the scene and at the hospital." (*Brady, supra,* 50 Cal.4th at p. 574.) And yes, Faria's father testified that his son said, "I love you" before leaving the night he was killed and Faria's mother described having a nightmare about being shot just before learning her son had suffered that same fate — testimony which Mendez challenges as "supernaturally tinged." But we saw no error in the victim impact testimony presented in *People v. Verdugo* (2010) 50 Cal.4th 263 (*Verdugo*), even though there the victim's mother described how her daughter had said, "I love you" before leaving

---

when [Mendez] killed them." (*People v. Booker* (2011) 51 Cal.4th 141, 191 (*Booker*).) Furthermore, we have repeatedly upheld the admission of gravesite photographs, and we do so again here. (See *Brady, supra,* 50 Cal.4th at p. 580 [collecting cases].)

the night she was killed, and even though another witness described how, after a murder, the victim's young goddaughter reported seeing the victim's ghost. (*Id.* at pp. 297-299.)

Further aspects of the victim impact testimony in this case mirror those we have permitted in other cases. We have allowed victim impact testimony detailing severe effects on family members, including a grieving mother's suicide attempts and hospitalizations. (*Booker*, *supra*, 51 Cal.4th at p. 193.) So the testimony in this case suggesting that the murders contributed to suicide attempts and hospitalizations — not to mention divorce, drug addiction, and gang activity — among the victims' family members "was relevant victim impact evidence," too. (*Ibid.*) We have also permitted victim impact witnesses to describe how they "imagined" their loved ones' final moments, reasoning that it is "obvious" to a jury "that family members of murder victims might imagine the victims' horror." (*People v. Cowan* (2010) 50 Cal.4th 401, 485; see also *People v. Pollock* (2004) 32 Cal.4th 1153, 1182 [approving victim impact testimony about frequently "imagining the suffering of [the victims'] final minutes"].) It is equally obvious that a parent would describe the murder of a child as a "tragic, sickening, evil, disgusting death," as Faria's father did. And, relatedly, we have said it is "a normal human response to the loss of a child" for such a parent to break down on the stand, as Salazar's mother did. (*Verdugo*, *supra*, 50 Cal.4th at p. 298.)

Mendez further argues the trial court prejudicially erred by admitting portions of the home video depicting Salazar's sixth grade graduation and allowing her mother to read the poem she wrote in fifth grade. We disagree. In *People v. Dykes* (2009) 46 Cal.4th 731, we upheld a trial court's decision to admit the entirety of an "eight-minute videotape" depicting

the victim — who was murdered at age nine — "and family members preparing for and enjoying a trip to Disneyland." (*Id.* at pp. 783-785.) And in *Brady* we allowed "a four-minute, edited videotape depicting" a slain police officer "celebrating Christmas, two days before his murder, with his family." (*Brady*, *supra*, 50 Cal.4th at p. 579.) If those videos were okay, so was this one.

As for the poem, we have on at least two occasions allowed an immediate family member to read a poem penned by the victim. (See *People v. Parker* (2017) 2 Cal.5th 1184, 1227; *People v. Suff* (2014) 58 Cal.4th 1013, 1076.) To be sure, that Salazar's poem bemoaned gang violence may have injected a cruel irony into the proceedings. But we fail to see how, under our precedents, that irony invited an irrational response from the jury. For one, we have upheld a trial court's decision to admit a cassette containing songs all about "losing someone, leaving someone, [and] having to say goodbye" that a murder victim coincidentally gave her father shortly before her death. (*Verdugo*, *supra*, 50 Cal.4th at pp. 297-299.) For another, although we did not describe the content of the poem at issue in *Parker*, we noted that the poem at issue in *Suff* was about the victim "stumbling and going through hell, but rejecting Satan" — and we held that this "contributed to the picture of the victim who was taken from the family." (*Suff*, at p. 1076.) So too here. The poem at issue in this case showed that, young as she was, Salazar was aware of, and reflected on, the dangerous world in which she lived.

For all these reasons, and because we decline to revisit our prior cases, we hold that the trial court did not err in admitting victim impact evidence at the penalty phase of Mendez's trial.

## H. Failure to Reinstruct at the Penalty Phase

At the start of the penalty phase, the trial court instructed the jury to "[d]isregard all other instructions given to you in other phases of this trial" but failed to reinstruct the jury on several general principles of law relevant to the penalty phase. Although we have held that similar oversights may constitute error, we have consistently deemed such error harmless under any standard. (See, e.g., *People v. Boyce* (2014) 59 Cal.4th 672, 714-717 (*Boyce*); *People v. Virgil* (2011) 51 Cal.4th 1210, 1276-1277; *People v. Ervine* (2009) 47 Cal.4th 745, 803-804; *People v. Moon* (2005) 37 Cal.4th 1, 35-39; *Carter, supra*, 30 Cal.4th at pp. 1218-1222.) Here too any error was harmless.

Mendez asserts prejudice resulted from the trial court's failure at the penalty phase to repeat the model instruction making clear that statements by attorneys are not evidence. (See CALJIC No. 1.02.) Specifically, he argues we must presume that without reinstruction the jury disregarded the guilt phase instruction to that effect. By failing to reinstruct, Mendez contends, the trial court essentially told the jury it could now consider the prosecutor's argument as evidence at the penalty phase.

We disagree. The trial court drew a clear line between evidence and argument at the penalty phase. It instructed the jury to make its penalty determination "[a]fter having heard all of the evidence, *and after having heard and considered the arguments of counsel*." (Italics added.) The upshot was obvious: evidence and argument are two different things. Any reasonable jury would have understood as much. Crediting Mendez's contrary argument would require us to "assume that jurors acted contrary to common sense simply on the basis of a

general direction to disregard the guilt phase instructions." (*Brasure*, *supra*, 42 Cal.4th at p. 1073.) That is an assumption we have declined to indulge in prior cases, and an assumption we decline to indulge in this one. (See, e.g., *ibid.*; *Boyce*, *supra*, 59 Cal.4th at p. 716.)

## I. Failure to Orally Impose Judgment on Enhancements

Mendez asserts that, because the trial court neglected to orally impose judgment on several enhancements, they must be stricken. We disagree.

At trial, the jury found the following enhancements to be true:

- Mendez personally discharged a firearm causing the deaths of both Faria and Salazar within the meaning of section 12022.53, subdivision (d). Those enhancements, as they then existed, were mandatory. (See § 12022.53, former subd. (h), amended by Stats. 2017, ch. 682, § 2, eff. Jan. 1, 2018 ["Notwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section."].)

- Mendez personally discharged a firearm causing the deaths of both Faria and Salazar for the benefit of, at the direction of, or in association with a criminal street gang, within the meaning of sections 12022.53, subdivision (e), and 186.22, subdivision (b)(1). Those enhancements were also mandatory. (See § 12022.53, former subd. (h).)

- Mendez committed both murders for the benefit of, at the direction of, or in association with a criminal street gang, within the meaning of section 186.22, subdivision (b)(1). Those enhancements could only be stricken "in an unusual case where the interests of justice would be best served, if the court specifies on the record and enters into the minutes the circumstances indicating that the interests of justice would be best served by that disposition." (§ 186.22, former subd. (d).)

At sentencing, the trial court said on the record, "It is the judgment and sentence of this Court that for the offense of murder as charged" as to both the Faria and Salazar killings "that [Mendez] shall suffer the death penalty." The trial court did not orally impose sentence on the above enhancements.

Instead, off the record, the trial court imposed two consecutive 25-years-to-life sentences for the section 12022.53, subdivision (d) enhancements to run concurrently with two consecutive 25-years-to-life sentences on the section 12022.53, subdivision (e) enhancements, as well as two consecutive three-year sentences for the section 186.22, subdivision (b)(1) enhancements to run consecutively with the sentences on the other two sets of enhancements. All told, then, the trial court belatedly imposed a 56-year-to-life sentence on the foregoing three sets of enhancements that was not part of the judgment it pronounced orally.

Nevertheless, we decline Mendez's request to strike those three sets of enhancements. The first two sets of enhancements were mandatory. So the oral sentence failing to impose them was "unauthorized" and thus "subject to judicial correction

whenever the error c[ame] to the attention" of a court. (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [holding on appeal that sentence enhancements must be imposed even though the People had not asked the trial court to impose them below].) Similarly, as we have explained, the trial court could not decline to impose the third set of enhancements unless it found that justice required leniency and explained its reasoning on the record. But the trial court made no such finding and gave no such explanation; to the contrary, by later endeavoring to impose this third set of enhancements, the trial court indicated it saw no reason for leniency. So here too the sentence pronounced orally was unauthorized and subject to judicial correction at any time. (See *ibid*.)

That conclusion accords with *People v. Mesa* (1975) 14 Cal.3d 466 and *In re Candelario* (1970) 3 Cal.3d 702. In both of those cases, we presumed that the trial court's silence about a prior conviction enhancement in its orally pronounced sentence indicated " 'that the omission was an act of leniency by the trial court.' " (*Mesa*, at p. 471, quoting *Candelario*, at p. 706.) But again, unlike in *Mesa* and *Candelario*, the trial court in this case had no ability to perform by silence any acts of leniency with respect to the enhancements. So here, unlike in those cases, the trial court's oversight resulted in an unauthorized sentence subject to subsequent judicial correction.

### J. Constitutional Challenges to California's Death Penalty Scheme

Mendez mounts several constitutional challenges to California's death penalty scheme. We have rejected each of them in prior cases, and Mendez has given us no persuasive reason to reconsider those decisions in this case. (See, e.g., *People v. Williams* (2013) 58 Cal.4th 197, 294-296 [holding that

(i) the special circumstances listed in section 190.2 are not so broad as to violate the Eighth Amendment; (ii) application of section 190, subdivision (a) is constitutional; (iii) the jury need not make written findings of aggravating and mitigating factors, agree unanimously that a particular aggravating circumstance exists, find all aggravating factors proved beyond a reasonable doubt, find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, or conclude beyond a reasonable doubt that death is the appropriate penalty; (iv) the Constitution does not require inter-case proportionality review; and (v) California's death penalty law does not deny capital defendants equal protection or violate the Constitution by operation of international law or by an accumulation of deficiencies]; *People v. Duff* (2014) 58 Cal.4th 527, 570 [holding that (i) the use of the adjectives "extreme" and "substantial" in section 190.3, subdivisions (d) and (g) is constitutional; (ii) the trial court need not identify mitigating factors as such; and (iii) reliance on unadjudicated criminal activity at the penalty phase is constitutional].)

## III. CONCLUSION

For the foregoing reasons, we affirm.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mendez

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S129501
**Date Filed:** July 1, 2019

_____

**Court:** Superior
**County:** Riverside
**Judge:** Edward D. Webster

_____

**Counsel:**

Randall Bookout, under appointment by the Supreme Court, for Defendant and Appellant.


Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Julie L. Garland and Ronald S. Matthias, Assistant Attorneys General, Holly D. Wilkens, Meagan J. Beale, Michael T. Murphy, Ronald A. Jakob and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Randall Bookout
Post Office Box 211377
Chula Vista, CA  91921
(619) 857-4432

Christine Y. Friedman
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9050