Filed 4/29/21  P. v. Shaffer CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>CHARLES LEROY SHAFFER,<br><br>       Defendant and Appellant. | A158950<br><br>(Napa County<br>Super. Ct. No. CR173868) |

After defendant Charles Leroy Shaffer pleaded not guilty by reason of insanity to the involuntary manslaughter of his nephew, he was committed to Napa State Hospital.  Two years later, the Napa County District Attorney filed a Penal Code section 1026.5[1] petition to extend his civil commitment. Following a jury trial, the jury found the allegations in the petition true, and the court ordered defendant's commitment extended for two more years.

Shaffer maintains there was insufficient evidence to support the jury's verdict, and that the court erred in admitting exhibits relating to the committing offense, including the 911 call and photographs of the victim and crime scene. We affirm.

---

[1] All further undesignated statutory references are to the Penal Code.

1

# BACKGROUND

*The Underlying Offense*

On Christmas day in 2014, defendant, along with his wife and son, visited relatives. He drank beer throughout the day. At one point, he pulled out a pocketknife and suggested killing some rabbits that were in cages and giving them to the neighbors.

After dinner, defendant's wife and son went home. Defendant stayed and planned to get a ride home with his nephew and the nephew's girlfriend, who had not been drinking. The three of them left the gathering at about 10:15 p.m. Defendant was very intoxicated and needed help getting to the car.

Defendant was in the rear passenger seat, his nephew was in the front passenger seat, and the nephew's girlfriend was driving. As they drove, the group chatted about what a nice Christmas it had been. The nephew asked defendant to stop kicking his seat, but "nobody was mad." When they drove onto a bridge, defendant started screaming, told the girlfriend to pull over, and said he was going to beat up his nephew.

From the corner of her eye, the girlfriend saw defendant's arm coming from the back seat of the car, and "thought he was hitting" his nephew. She saw defendant hit his nephew "four or five times." Defendant yelled "pull the car over. I'm gonna beat the fuck out of this dude." The girlfriend pulled over, and "saw blood gushing from the side . . . of his head." She called 911, but at that point did not realize defendant had used a knife.

Defendant then seemed to "snap[] out of it," and "looked kind of lost." The nephew's girlfriend testified she believed defendant "had some kind of episode." When the 911 operator instructed her to put pressure on the

2

nephew's wound, she gave her sweatshirt to defendant who put it on the wound.

Paramedics could not revive the nephew, and he was pronounced dead at the scene. Police found a knife in the backseat of the car, and arrested defendant. They took photographs of his nephew, the knife, and the inside of the car, some of which were admitted into evidence at the hearing.

A criminalist estimated that defendant's blood alcohol level at the time of the killing would have been about .26, based on his tested blood alcohol level of .19 at about 3:00 a.m. in the morning after the incident.

Defendant pleaded not guilty by reason of insanity to the charge of involuntary manslaughter and use of a knife, and was committed to Napa State Hospital.

*The Commitment Hearing*

About two years later, the Napa County District Attorney filed a petition to extend defendant's commitment, alleging defendant represented a substantial danger of physical harm to others by reason of mental disease, defect or disorder.

At the hearing, a coworker testified about a 2013 incident similar to the one which lead to defendant's commitment. The coworker and defendant attended a work-related party. Defendant became noticeably intoxicated and could "barely stand up." The coworker offered to drive him home, and a woman who knew where defendant lived came along. She sat in the front passenger seat, and defendant sat in the back seat. As they were driving toward defendant's home, he started repeating "who are these people? We need to get out of here." Then defendant began hitting the coworker in the back of the head. As the coworker blocked defendant's hand, he heard the female passenger's head hit the window. He pulled over, and the woman said

3

defendant had hit her.  Defendant got out of the car, and asked "I thought we were going home?"  When told he had attacked his coworker, he said he did not remember it.  After the woman called her husband, defendant's wife arrived, yelled at defendant to get in the car, and they left.

Another coworker testified defendant showed him a video at work which showed Russian soldiers "executing a guy with a knife in the neck." "[T]hey had thrown him to the ground, were stepping on him, and then they used a bayonet knife to shove it in the guy's neck."  It seemed odd to the coworker, and there was no work purpose to it, nor something that commonly happened in the shop.

The same coworker also testified if defendant drinks enough alcohol he "become[s] a different person" and gets "more aggressive and more handsy." In one incident, they were drinking at a bar, and a man was outside selling knives.  Defendant went outside to see how much the knives were, and when he returned he was "really mad at the guy."  The coworker testified defendant "had that Popeye look and gritting through his teeth saying he didn't like that guy and he wanted to go out there and beat him up."

The prosecution presented the testimony of four expert witnesses, one on rebuttal.  All the medical professionals agreed that although defendant was in institutional remission and currently asymptomatic, he suffered from both alcohol-use disorder and "other specified trauma and stressor related disorder."  All opined that due to his mental disease, defect or disorder, defendant represented a substantial danger of physical harm if released into the community.

The specifics of the experts' testimony follows:

Dr. Sarah Moseman, a clinical psychologist, explained defendant had "specified trauma and stressor-related disorder," which is a condition in

4

which "a person has symptoms that are characteristic or typical of post-traumatic stress disorder ([PTSD]) but they don't quite meet full criteria for that diagnosis." There are eight criteria required to diagnose a person with post-traumatic stress disorder, and defendant had only seven.

Defendant met the first of those criteria, being exposed to actual or threatened death, based on "multiple instances of witnessing violence, exposure to actual or threatened death" in the military while stationed in both Afghanistan and the Philippines. While in the Philippines, he was attacked in a taxicab. He was also exposed to violence while in jail for the underlying offense, when his cellmate attempted suicide. As to the second criterion, intrusive symptoms associated with the traumatic event, defendant reported nightmares and "thrash[ing] about" in his sleep, which lead him to sleep separately from his wife. He also had "instances of suspected dissociation or being separate from his consciousness where he just kind of blacked out and wasn't really aware of what was going on." The psychologist described the two instances in which defendant attacked people when he was being driven in a car, including the incident in which he killed his nephew, as examples.

The third PTSD criterion is "avoidance of stimuli associated with a traumatic event." As to that, defendant avoided talking or thinking about his time in the military. When driving, defendant would "leave extra room between cars in case he had to quickly evade which was similar to when he was deployed in Afghanistan . . . to evade incoming attacks." He also would "sit close to exits" and "have a view point of the room to see if there was any kind of possible threat."

Dr. Moseman did not believe defendant met the fourth criterion, which was "negative alterations in cognition and mood."

5

The fifth criterion is "marked alterations and arousal and reactivity associated with the traumatic event." Defendant reported trouble sleeping, a startle response, and hypervigilance, all of which meet the fifth criterion.

The sixth criterion is that the disturbance last more than a month. Defendant reported "his symptoms started in about March of 2012 when he returned and then lasted until early 2016 while he was in jail following his crime."

The seventh PTSD criterion is "the disturbance caused clinically significant distress or impairment in social or occupational areas of functioning." Dr. Moseman opined that, although defendant did not report "global overall difficulty functioning in his life," the fact that he killed his nephew "under the circumstances that he did" demonstrated he met the seventh criterion.

The eighth criterion is "the disturbance is not attributable to physiological effects of a substance." Dr. Moseman testified "the symptoms themselves cannot be due solely to using alcohol or drugs. In [defendant's] case it appears that using alcohol exacerbated or made worse his symptoms but did not cause them all. They occur even when he [is] sober."

Because defendant met only seven of the eight criteria, Dr. Moseman opined he suffered from "other specified trauma and stress related disorder," which is a "mental disease, defect, or disorder." She also noted defendant's records indicated he continued to suffer from symptoms of PTSD after he was jailed in 2016. She explained people who have PTSD symptoms but are diagnosed with "other stressor-related disorder" can have periods without symptoms which then reoccur. Such an individual might only be triggered or exhibit symptoms in certain situations and may not exhibit symptoms in a low-stress environment.

Dr. Moseman opined defendant also had alcohol use disorder, also a mental defect, disease or disorder. His disorder was in remission, due to being in an environment where alcohol was unavailable. Dr. Moseman testified defendant met two of the criteria for alcohol use disorder; using more alcohol than intended, and continuing to use despite social or interpersonal "problems caused or exacerbated by the alcohol." Defendant had reported drinking twice the amount of alcohol he consumed before his military deployment. He was using alcohol to "self[-]medicate PTSD symptoms." The social problems caused by his alcohol use included having sex with a friend of his wife's while intoxicated but having no memory of it, and the two incidents in which he attacked people while in the back seat of cars.

Dr. Moseman utilized a violence risk-assessment tool called the HCR-20, which looks at 20 risk factors. It is "an acceptable measure for violence risk assessment" in the scientific community, is used at state hospitals, and is "a fairly accurate measure." Ten of the 20 risk factors are historical, because "one of the greatest predictors of a person's future behavior is past behavior and their past history."

In evaluating defendant, Dr. Moseman considered her discussions with defendant, review of his records, his trauma disorder and alcohol use disorder, his past violent behaviors, his problems with personal relationships, his lack of insight into his alcohol problem and failure to develop a forensic relapse prevention plan. She opined defendant had a mental disease, disorder or defect and that because of those disorders, posed a substantial danger to others if released. She also opined he has a serious difficulty controlling that dangerous behavior.

Cynthia Perez, a forensic mental health clinician who worked for Napa County Mental Health Con-Rep, testified as an expert in substance abuse

7

assessment and treatment. She also qualified as an expert in evaluating whether patients can be safely released into the community. Perez explained a patient committed to the state hospital can be released to Con-Rep, which is a structured board and care. It is a "step[-]down" from the hospital, but still a supervised environment.

Perez conducted three assessments of defendant for Con-Rep. In one interview, defendant told her he owned a brewery with a friend, and asked if she thought "it would be okay if [he] tasted the beer," which she found "very concerning." Perez and her supervisor also reviewed defendant's "Forensic Relapse Prevention Plan," and concluded it lacked substance.

Based on her interviews of defendant and review of his file, Perez opined defendant did not have insight into the severity of his alcohol use or the relation between his alcohol use and his violence. She explained he minimized his alcohol use and denied any connection between his alcohol use and killing his nephew. Perez recommended he continue on the substance abuse unit of the hospital and "be more aware and get more familiar with triggers and how he's going to deal with alcohol out in the community." She noted defendant had "only been sober since he's been in a controlled environment." Perez opined defendant could not be safely released into the community, and if he were released "without Con-Rep[,] he would pose a substantial danger to the community."

Dr. Muhammad Tariq, a Napa State Hospital staff psychiatrist assigned to the substance recovery unit, was defendant's treating psychiatrist. He testified defendant was diagnosed with "other specified trauma and stress related disorder" because he did not meet one of the criterion for a post-traumatic stress diagnosis. Defendant was also diagnosed with "alcohol use disorder mild in sustained remission in a controlled

8

environment[,] because he had been in a controlled environment since the offense." Dr. Tariq agreed with those diagnoses, which qualified as a "mental disease, disorder, or defect."

Dr. Tariq testified defendant had just started taking medication for his alcohol use disorder that "helps with cravings so the patients would have less urge to drink." Hospital reports from 2018 indicated defendant had reported symptoms of PTSD, which contradicted his self-reporting of no symptoms since 2016. He evaluated defendant a week prior to trial, and concluded he represented a "substantial danger of physical harm to others if he's released into the community not on Con-Rep." He explained defendant's past behavior, including defendant's "significant history in terms of the death of his nephew," was part of his assessment. Dr. Tariq also based his opinion on defendant's "history of mental illness," and "history of significant alcohol use disorder." Because defendant had "done well in the hospital" and "recently been working on improving his insight in terms especially related to his alcohol use disorder," Dr. Tariq recommended defendant's commitment be extended but he be released to a "structured outpatient treatment program" known as "Con-Rep." Dr. Tariq opined defendant would "have serious difficulty controlling his dangerous behavior if he's released into the community unsupervised."

The defense called Dr. David Joseph, a clinical psychologist, to testify about the diagnosis and treatment of psychological disorders and the evaluation of clinical risk assessment. He reviewed defendant's hospital and medical records and the police report regarding defendant's killing of his nephew. He also interviewed defendant, and administered two psychological tests, the MMPI and the "post traumatic stress disorder checklist" for the military (PCLM).

Dr. Joseph testified defendant met only one of the criteria for PTSD, that he had experienced a traumatic event. Based on the MMPI results and his hospital records, Dr. Joseph concluded defendant was a reliable reporter of his symptoms. He saw nothing in the hospital records indicating defendant had "angry flareups," nightmares, or a "flashback." It was "difficult" to assess "his state in terms of alcohol . . . because he's in an environment where alcohol isn't available." He concluded defendant did not currently suffer from a mental disorder, did not pose a substantial danger of physical harm to others, and saw no evidence defendant had serious difficulties controlling his dangerous behavior. He acknowledged defendant did not have much insight into his own symptoms, and "he could be having symptoms right now and he just might not know it."

In rebuttal, the prosecution called Mikel Matto, an assistant clinical professor of psychiatry at the University of California San Francisco medical school. He reviewed defendant's military, hospital, and police records, and interviewed him for about three and a half hours. Matto agreed with defendant's diagnosis of alcohol use disorder and "trauma or stressor related disorder," and testified both qualify as a mental disease, defect or disorder.

Matto talked with defendant about the killing of his nephew. Matto was concerned that defendant did not use "active phrasing" in describing his killing of his nephew. Instead, defendant described the killing as " 'my sister lost her son,' " " 'the time my nephew got stabbed,' " or "the thing that got me here," rather than saying " 'I killed my nephew,' " which is important because it would "indicate[] a level of insight and accountability that's important for relapse prevention." Defendant told Matto his PTSD symptoms got better when he was in jail, and "in early [2016] they were gone." Matto found it unusual that PTSD symptoms would "last[] for years—2012, 2013, 2014,

10

2015, into 2016" but would resolve when defendant was in jail and receiving no treatment.  In Matto's experience, PTSD symptoms tended to get worse in jail or prison.

Matto conducted a risk assessment of defendant using the HCR-20, which is a violence risk assessment instrument.  The most prevalent factor's in defendant's case were the incidents of violence, "typically while intoxicated, of demonstrating aggressive behavior, violent behavior, and including assaults and ultimately the killing of his nephew.  That was obviously a highly relevant factor."  Matto explained past behavior is "some of the best evidence of how people will behave in the future."  Other risk factors were defendant's alcohol use disorder, his trauma and stress related disorder, and his lack of insight into his alcohol use disorder.  Matto opined defendant had poor insight in regards to the alcohol use disorder and did not appear to understand his alcohol disorder causes him to act violently.  For example, even though in 2013 defendant attacked a friend while a passenger in a car and blacked out, he sought no treatment after that incident and continued to drink alcohol.

Matto's opinion was that based on defendant's mental disease, defect, or disorder he posed a "substantial danger of physical harm to others and [has] serious difficulty controlling that dangerous behavior."

Defendant's wife testified on his behalf.  She opined defendant was a truthful person, and "[i]n the community he's always been peaceful as far as I know."  She acknowledged he "killed his nephew during an incident."  She testified he was involved in another incident "that would be similar to this [when] he was drinking."  Defendant was getting a ride home, and she "got a phone call from people that were in the car saying come get [defendant]."  She also testified about an incident in which she and defendant had been

11

drinking all day, and invited a woman to come to their home. After the wife went to bed, she woke up and found defendant having sex with the woman. She testified defendant "was not aware what was going on."

Defendant's wife visited him while he was in jail and in the Napa State Hospital. She "never thought he had a mental health problem to begin with," and did not discuss his treatment with him. Defendant "never spoke" to her about experiencing PTSD symptoms. She had been in the military for almost 30 years, so she "recognized some signs," but defendant told her "he was okay." She was not aware defendant had been diagnosed with alcohol use disorder, but she would not support him drinking alcohol in the future because "he has an issue with it." She had no concerns he would act violently again if he was released "[b]ecause he has never done anything like this before." She did not discuss his diagnoses when she visited him because it might upset him and she did not "want to take the chance of him being upset."

When defendant was first arrested, she told the detective "one of two things happened. He's either suffering—he had a psychotic break from PTSD or he was invaded by a demon because he would never ever do this." She "heard" about the other incident when defendant was a passenger in the back of a car, but the coworker who was driving "didn't say that he had been hurt" and he "mentioned that . . . [defendant] . . . might have hit" the female passenger. She then acknowledged defendant "told me he remembered he had hit [the driver], and he doesn't remember hitting [the female passenger], but he remembered hitting [the driver] by accident. As to his behavior when he drank alcohol, she testified that even after eight or nine drinks, defendant "just got more funny . . . and he got more loving."

12

A friend and coworker of defendant's testified he believed defendant was honest and "had a penchant for wanting to do things accurately and by the book." He thought defendant's killing of his nephew was "way out of character," and did not "have any concerns with him being released." He hoped defendant's time in the state hospital had helped him "with some coping skills to kind of relieve that tension and that pressure that a lot of your veterans don't get."

Defendant testified about traumatic events in his life. In 1988, he was stationed in the Philippines. He and a friend were in the back seat of a taxi when the driver took off in the wrong direction, then stopped to let in a man with a gun who pointed it at defendant. As the driver started to leave, defendant and the friend jumped out of the moving vehicle.

In the mid-1990's, defendant and a friend were walking home when they were attacked by a group of "gangster kids." Defendant told his friend they should "get out of here," and "fought [his] way through." He realized his friend was not with him, "got some people," and went back to find his friend "laying in the street bleeding." He had been stabbed 15 or 16 times.

In 2006 or 2007, defendant was deployed to Afghanistan. He worked as an armed escort, escorting people into areas "people wouldn't normally have access to." There were times when he was doing that work that he felt unsafe. Defendant was deployed a second time to Afghanistan in 2011-2012, and given a more dangerous assignment designated "HRC," meaning high risk of capture. His job was to drive an armored vehicle in urban areas outside the base, which they did in convoys for safety. Defendant and his passengers would all act as lookouts for danger on the road. They experienced hostility or threats on a daily basis. One night, his base was attacked by rockets and mortars. He took cover by laying on the floor during

13

the attack. It was "very scary" because it was the first time he had been under direct fire. Defendant personally knew people who had been killed in Afghanistan.

When he returned home, defendant suffered from nightmares and flashbacks. He was "hyperalert, hypervigilant, [and had] serious anxiety." He was easily startled, and "didn't like confined spaces." When he drove, defendant "was always scanning . . . [l]ooking for a way out." He would see "something in the news that might trigger thoughts that was coming back." His alcohol consumption increased, from "a beer or two" each evening to "four, five, six, seven beers." Defendant "thrash[ed] around" so much during his nightmares that he and his wife stopped sleeping in the same bed.

Defendant recalled some of the events of Christmas 2014. He was at his mother's house with other family members, including his nephew. He became "highly intoxicated" and thinks he had about 10 beers. Defendant remembered nothing "from the time I got in that vehicle until the time I was on the side of the highway." He only remembered talking to a sheriff's deputy on the side of the road, being asked if he had any weapons. and being questioned afterwards. Defendant testified he had blacked out from alcohol on several occasions before the killing, including when he hit his friend in the backseat of a car, when he had sex with a woman "who was not [his] wife," and when he was "a young guy in school."

Defendant testified he never discussed tasting beer at his brewery with Perez from Con-Rep. Instead, he had discussed his "future plans for the brewery" with another provider. Defendant explained he owned a brewery with some partners, and would taste the beer "at the end of a brewing session . . . before there's even alcohol in it." He felt that provider was "confused so that went into his report stating that I was gonna taste beer or requesting

14

beer tasting. . . . " Defendant acknowledged there were "[a] couple of incidents" of confusion between him and mental health professionals.

The jury found defendant suffered from a "mental disease, defect, or disorder," and as a result of that mental disease, defect or disorder, he "now. . . [p]oses a substantial danger of physical harm to others if released; and . . . [h]as serious difficulty controlling his behavior if released." The court ordered his commitment at Napa State Hospital extended until December, 2021.

## DISCUSSION

### *Substantial Evidence Supports the Jury's Finding That Defendant Has Serious Difficulty Controlling His Dangerous Behavior*

#### *Legal Standard*

"Under section 1026.5, subdivision (b)(1), '[a] person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others.' At no less than 90 days before the term of commitment ends, the prosecuting attorney may file a petition for extended commitment in the superior court which issued the original commitment. (§ 1026.5, subd. (b)(2).) The person named in the petition has a right to be represented by an attorney and the right to a jury trial. (§ 1026.5, subd. (b)(3).) If, after trial, the court or jury finds the patient 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others,' the patient will be recommitted for an additional period of two years from the date of termination of the previous commitment. (§ 1026.5, subd. (b)(8).)" (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1159.)

15

"[S]ection 1026.5, subdivision (b)(1) should be interpreted as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior. . . ."[2] (*People v. Bowers* (2006) 145 Cal.App.4th 870, 878 (*Bowers*).) "The People are not required to prove the defendant ' "is completely unable to control his behavior." ' (*People v. Williams* (2003) 31 Cal.4th 757, 771. . . , quoting *Kansas v. Crane* (2002) 534 U.S. 407, 411, . . . (*Crane*).) Instead, the defendant's 'impairment need only be serious, not absolute.' (*Williams*, at p. 773.) As the *Crane* court explained, 'there may be "considerable overlap between a . . . defective understanding or appreciation and . . . [an] ability to control . . . behavior." ' " (*People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1370.)

" ' "Whether a defendant 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others' under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony." [Citation.] "In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]" [Citation.]' [Citation.] A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes

---

[2] That additional requirement was added following the California Supreme Court's opinion in *In re Howard N.* (2005) 35 Cal.4th 117, (*Howard N.*). In that case, the court considered the extended detention scheme under Welfare and Institutions Code section 1800 et seq., (*id.* at p. 122) and concluded due process required a finding that the person's "mental deficiency, disorder, or abnormality" caused him or her "to have serious difficulty controlling his [or her] dangerous behavior." (*Id.* at p. 135.)

16

substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*Bowers*, *supra*, 145 Cal.App.4th at pp. 878-879.)

### *The Evidence*

Defendant does not dispute that he suffers from a mental disease, defect, or disorder. Nor does he contend there was not a sufficient showing of "future dangerousness." Instead, defendant maintains there was no substantial evidence that he "currently has serious difficulty controlling his dangerous behavior." (Boldface omitted.)

Relying on *People v. Galindo* (2006) 142 Cal.App.4th 531 (*Galindo*), defendant claims an extension of a commitment requires "both a prediction of future dangerousness and evidence of a current lack of volitional control." Asserting the evidence showed his "behavior was that of a model patient," defendant maintains there was no substantial evidence he currently has serious difficulty in controlling dangerous behavior.

In *Galindo*, the defendant, who suffered from bipolar disorder and antisocial personality disorder, was recommitted following a trial. (*Galindo*, *supra*, 142 Cal.App.4th at pp. 533-534.) The defendant claimed there was insufficient evidence he had serious difficulty controlling his dangerous behavior, despite evidence that he had actually engaged in dangerous behavior while committed, including "pursu[ing] a 'very fragile psychotic patient'" after being told to stop. (*Id*. at pp. 534, 538.)

The court acknowledged there was "abundant evidence that defendant's behavior was dangerous and that he did not, in fact, control it. However, the fact he *did not* control his behavior does not prove that he was *unable to do so*, thus making him 'dangerous beyond [his] control.' (*Howard N.*, *supra*, 35 Cal.4th at p. 128.)" (*Galindo*, *supra*, 142 Cal.App.4th at p. 539.) The court explained "[t]here was little, if any, evidence that he *tried* to control his

17

behavior, that he encountered *serious difficulty* when trying to do so, or that his difficulty was *caused by* his mental condition.  Rather, the evidence strongly suggested that defendant *did not try* to control his dangerous behavior, because he perceived no reason to do so." (*Ibid*.)  No expert in that case had opined that defendant "tried to control his dangerous behavior but encountered serious difficulty in doing so."[3]  (*Ibid*.)  Thus, the court reversed the order extending commitment. (*Id*. at p. 540.)

Contrary to defendant's claim, *Galindo* does not aid him.  The *Galindo* court made a distinction between *not* controlling dangerous behavior and being *unable* to control dangerous behavior and concluded the inability to control dangerous behavior was the critical factor.  (*Galindo*, *supra*, 142 Cal.App.4th at p. 539.)  In contrast, the evidence and expert testimony in this case showed that while defendant did not engage in dangerous behaviors while committed, he would have serious difficulty controlling his dangerous behavior in a noninstitutional setting.

The court in *People v. Williams* (2015) 242 Cal.App.4th 861 (*Williams*), addressed circumstances similar to those here.  In *Williams*, the defendant was committed after being found not guilty by reason of insanity of attempted murder and assault on a custodial officer, among other charges.  (*Id*. at p. 863.)  Defendant was diagnosed with "alcohol and amphetamine dependence and personality disorder NOS (not otherwise specified)." (*Id*. at p. 864.)  He had "never been violent or threatening during his hospitalization." (*Id*. at p. 866.)

---

[3]  The extension of commitment hearing in *Galindo* was held before the decision in *Howard N.*  (*Galindo*, *supra*, 142 Cal.App.4th at p. 539.)

At his commitment extension trial, the prosecution's expert testified defendant had only started attending substance abuse recovery two-three months before trial. (*Williams, supra,* 242 Cal.App.4th at p. 866.) His relapse plan was not "realistic," "appeared to consist only of physically avoiding temptation," and seemed to have been " 'done hastily at the last minute to make sort of an impression.' " (*Id.* at pp. 867, 874.) The expert testified defendant "was not a danger to others in a hospital setting, but if released without supervision, he would pose a 'really significant' danger." (*Id.* at p. 867.)

The court rejected defendant's claim that "his lack of violence since he was hospitalized showed he could control his behavior." (*Williams, supra,* 242 Cal.App.4th at p. 875.) The court explained the issue was "not whether defendant could put on a facade of friendliness and cooperation in the hospital setting in order to achieve his goal of unsupervised release, but whether he would have serious difficulty in controlling dangerous behavior once he had attained that goal and no longer had expert help or support to keep him on the straight and narrow." (*Ibid.*) The court concluded "defendant's prior history of violence was connected to his substance abuse, which he was not able to engage in while hospitalized. Since he had no credible relapse prevention plan, his lack of violence in confinement was not substantial evidence that he could control his impulse toward violence on unsupervised release." (*Ibid.*)

So too here. Although defendant had not engaged in dangerous behavior while institutionalized, he suffers from both other specified trauma disorder and alcohol use disorder, which can trigger his dangerous and violent behavior. Defendant had a significant history of past violence triggered by alcohol use. He had only recently begun to address his alcohol

19

use disorder and lacked insight into the connection between it and his violent behavior. His relapse prevention plan was inadequate. Indeed, defendant told mental health professionals that he planned to operate a brewery upon release and asked if tasting the beer would be acceptable.

Substantial evidence supports the jury's verdict.

### Admission of Evidence Regarding the Commitment Offense

Defendant maintains the trial court abused its discretion in admitting certain evidence regarding the underlying commitment offense. He claims it was error to admit six photographs of the victim showing his wounds, four photographs showing the bloody front and back seat of the car, and a photograph of the knife used. He also objects to admission of an audio recording of the 911 call, a transcript of that call, and the actual knife used. Defendant maintains this evidence was "not relevant to the question before the jury," and was more prejudicial than probative under Evidence Code section 352.

The issues in dispute were whether defendant "suffers from a mental disease, defect, or disorder," and whether "[a]s a result of his mental disease, defect, or disorder, he now: . . . [p]oses a substantial danger of physical harm to others; AND . . . [h]as serious difficulty in controlling his dangerous behavior."

Defendant claims "[t]he commitment offense was not in dispute," and asserts "[w]hat is relevant is how a defendant is doing presently in the location where he or she has been committed." He later concedes, however, "that the facts underlying the commitment offense were relevant."

" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the

20

action." (Evid. Code, § 210.) In determining whether defendant has serious difficulty controlling his dangerous behavior, relevant evidence "include[s] . . . previous instances of violent behavior . . . , as well as the determination of the treatment staff . . . [defendant's] behavior at that facility and psychiatric evaluations." The statutory scheme contemplates that the "trier of fact shall be aided by the expert testimony of psychologists or psychiatrists. (§ 1026.5, subd. (b)(7).)" (*People v. Superior Court* (*Blakely*) (1997) 60 Cal.App.4th 202, 215.) "As we have recognized, '[p]revious instances of violent behavior are an important indicator of future violent tendencies.' " (*Kansas v. Hendricks* (1997) 521 U.S. 346, 358; *id.*, at p. 350 [considering civil commitment under the Kansas Sexually Violent Predator Act].) And, evidence of the nature and severity of the underlying crime are also relevant foundational facts underlying the expert's opinions in the case. Indeed, defendant concedes "that under *People v. Sanchez* (2016) 63 Cal.4th 665, for the prosecution experts to rely on certain details of the commitment offense, those details must be independently proven."

Thus, these exhibits were relevant to the issues at trial.

Defendant next claims the exhibits at issue "had little to no probative value regarding [his] mental state now," but "pack[ed] an emotional wallop." He maintains the photographs were "bloody," and the audio and written transcript of the 911 call made by his nephew's girlfriend after the stabbing were "highly charged," and the girlfriend's "upset is evident."

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice. . . ." (Evid.Code, § 352.) " 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally

flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958.)

" 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory.' " (*People v. Ramirez* (2006) 39 Cal.4th 398, 453.) "Such a photograph may be admitted if: (1) the photograph is relevant, and (2) its probative valued is not substantially outweighed by the risk of unfair prejudice." (*People v. Mendez* (2019) 7 Cal.5th 680, 707-708 (*Mendez*).)

" '[A] court may admit even "gruesome" photographs if the evidence is highly relevant to the issues raised by the facts, or if the photographs would clarify the testimony of a medical examiner.' [Citation.] 'We have consistently upheld the introduction of autopsy photographs disclosing the manner in which a victim was wounded as relevant not only to the question of deliberation and premeditation but also aggravation of the crime and the appropriate penalty, all of which were at issue here.' " (*People v. Ramirez, supra.* 39 Cal.4th at pp. 453-454.) " '[G]ruesome' " and " 'disturbing' " photographs may be admitted if they do not " 'sensationalize an alleged crime' " and are not " 'unnecessarily gruesome.' " (*Mendez*, *supra*, 7 Cal.5th at p. 708, italics omitted.)

The court considered each photo individually as to whether it should be excluded under Evidence Code section 352. In considering whether the photographs of the victim and crime scene at issue were more prejudicial than probative, the court reasoned the prosecution had "to show proof of dangerousness now beyond a reasonable doubt. And what makes these photographs disturbing, if they are at all disturbing, is that it shows a

22

dangerous attack. And so they are highly probative." They court excluded a photo of the victim's face as overly prejudicial, but concluded the photo of the knife used, the knife itself, and the photos of the victim and crime scene were not more prejudicial than probative.

As to the 911 call, the court explained: "When the court listens to this 9-1-1 call and really contemplates what the relevance is, the court directly finds it to be relevant to [CALCRIM No.] 3453 in the inquiry of the jury as to whether the [defendant] poses a substantial danger of physical harm to others and has serious difficulty in controlling his dangerous behavior. Something that was interesting about this call was that after the call was made that the caller really felt that she wasn't in any danger. That the level of dangerousness had subsided. That it was a momentary attack and things kind of went back to normal. It also goes to the intoxication. Specifically to the difficulty in controlling a dangerous behavior. From what I understand of the facts the long-term alcohol diagnosis and difficulty in controlling that over a number of incidents mixed with the dangerousness of the attack is going to be critical points for the jury . . . [and] this phone call is highly relevant as proof of that specifically to dangerous or not."

As to the photo of the knife used in the killing and the knife itself, the court stated, "I think a photograph of the knife, its probative value is not substantially outweighed by a substantial danger of undue prejudice. It was the weapon that was used during the attack and that will be admitted." "The physical knife itself . . . [is] something that they can hold in their hands. Of course the knife is not something that would go to the jury on their own so that they're passing around a knife. But it is the weapon that caused the death in this case, and I think that the jury should be able to inspect it and see it potentially if the proper foundation is laid. . . . I'm going to admit it

23

over 352. . . . [I]t's definitely relevant. I don't believe it would create a substantial danger of undue prejudice or confuse the issue or misled the jury."

In sum, the exhibits were relevant to the issue of whether defendant had serious difficulty controlling his dangerous behavior. As in *Mendez*, "the record demonstrates the trial court was 'aware of [its] duty to weigh the prejudicial effect of the photographs against their probative value' and performed that duty 'carefully,' . . . weigh[ing] against finding an abuse of discretion." (*Mendez, supra,* 7 Cal.5th at p. 708.) Although some of the exhibits depicted blood, severe injuries, and an upset witness, their effect was only " 'the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' " (*People v. Zapien*, *supra*, 4 Cal.4th at p. 958.) The court did not abuse its discretion in admitting these exhibits.

## DISPOSITION

The order extending defendant's commitment is affirmed.

_____

Banke, J.


We concur:


_____

Humes, P.J.


_____

Margulies, J.


A158950, People v. Shaffer

25