Filed 11/4/25  P. v. Harker CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KEVIN HARKER,<br><br>Defendant and Appellant. | C098438<br><br>(Super. Ct. No.<br>SCCR-CRF-2021-0303) |

Defendant Kevin Harker appeals following his conviction on various counts, including for torture, aggravated mayhem, assault with a deadly weapon, and criminal threats.  Harker contends that his convictions should be reversed because the trial court abused its discretion in admitting certain evidence at trial and because he received ineffective assistance of counsel.  Finding neither argument persuasive, we affirm the judgment.

## BACKGROUND

Charges in this case were first filed in March 2021.  Several attorneys represented Harker over the course of pretrial proceedings.  His trial counsel was appointed in March 2022, one month before trial was set to begin, and obtained several continuances to prepare.  Trial began in January 2023.

1

A second amended information, filed after the presentation of the prosecution's evidence at trial, charged Harker with torture (Pen. Code, § 206; count 1), aggravated mayhem (§ 205; count 2), assault with a deadly weapon (§ 245, subd. (a)(1); counts 3, 4, 11, 14, 15, and 17), criminal threats (§ 422, subd. (a); counts 5 and 6), injuring a dating partner or a child's parent after a prior conviction (§ 273.5, subds. (b)(3), (b)(4), (f)(1); counts 7, 12, 13, 16, 18, and 19), first degree residential burglary (§ 459; count 8), kidnapping (§ 207, subd. (a); count 9), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 10).[1] It further charged various special allegations and aggravating factors.

The evidence at trial showed that the 19 counts alleged in the information related to numerous violent incidents between Harker and the victim over the course of their romantic relationship. In her extensive testimony, the victim described being physically attacked or threatened by Harker on numerous occasions between the summer of 2018 and the end of 2020. She would leave him for a few days after being assaulted but would eventually return. The victim estimated that Harker assaulted her with a weapon at least 25 times over the years. Many of these episodes resulted in the victim receiving treatment at the hospital or calling the police, but she did not report who had injured her until after her hospitalization in December 2020. The victim further testified that she had a history of drug addiction and that both she and Harker used drugs for significant portions of their relationship.

In November 2020, the victim gave birth to the couple's baby, who had to be placed in neonatal intensive care at a hospital an hour away from their residence. According to the victim, Harker would not let her take his car to visit the baby, so she had a friend drive her there and arranged for alternative transportation back for a counseling

---

[1] Undesignated statutory references are to the Penal Code.

2

class.  After attending the class, the victim went to a friend's house for the night and told Harker, via text message, that they needed to separate.  Harker texted back that he was going to kill her and then entered the friend's house with a gun and forced the victim to go with him to a motel where he was staying.

The victim then described how, the next evening while driving together outside of town, Harker learned that it was a man who had driven her to her counseling class.  Harker began punching her and trying to stab her with a pocketknife.  The victim climbed into the backseat of the SUV to escape his reach.  As Harker slowed the vehicle, the victim realized that she might be able to jump out without getting hurt.  She opened the door and put one foot on the ground; but as soon as she did, Harker accelerated, and she lost her footing.  She was hanging onto the door handle and frame while being dragged and screaming for him to stop because she believed she was going to fall.  As Harker continued to speed up, the victim fell, and the vehicle ran over the left side of her body.  In her testimony, the victim described being unable to move her shoulder and stated that her leg "was completely snapped in half," with "the bone sticking out of [her] leg."  Harker drove the SUV back to her, berated her, and hit her in the face.  He then placed her in the front seat and drove to his father's house, which they had just left.  Harker continued to yell at her that she was "a cheating whore" and that he was going to kill her.

Upon arriving at his father's house, the victim heard Harker yell over a fence for his brother to give him a shovel "because he was going to make [her] dig [her] own grave."  She saw the brother hand Harker a shovel, which Harker threw in the backseat of the SUV before driving back toward town.  Harker stopped at three bridges that they passed along the route, stating at each stop that he was going to throw her over.  She also testified that Harker stopped at the home of another of his brothers to retrieve a gun, but the brother was sleeping, so they drove on to Harker's motel.

As they drove through town, they passed one of Harker's friends.  According to the victim, Harker pulled over and asked his friend to help him "bury" the victim, but the

friend refused. The victim was shivering and in "a lot of pain" by then. Harker took her back to the motel and brought some clothes down to her in the car because her pants were soaked in blood. It had been roughly two hours since her injury, and Harker had not tried to render first aid or bandage her leg. After initially stating that he would not take her to the hospital, Harker agreed to do so, noting that she was "bleeding a lot." This was conditioned upon the victim agreeing not to tell the police what he had done.

The victim testified that they arrived at the local hospital early in the morning of December 5, 2020, while it was still dark. After being transferred to another hospital, the victim underwent surgery on her left leg, which had sustained multiple fractures. The surgeon testified that the leg bone had protruded through the skin at the time of the injury and that the victim had a dislocated and broken shoulder and was covered in abrasions.

Roughly one week after being discharged from the hospital, the victim went to the police and reported Harker's actions in the days leading up to her hospitalization. She also reported previous occasions during their relationship when Harker had assaulted her.

The victim and Harker subsequently reconciled for a time, but in late March 2021, Harker was taken into custody after another altercation with her. He and the victim made plans for her to give a false statement to the district attorney regarding the charges that had been filed in this case. When she met with an investigator from the district attorney's office, she told him that she accidentally fell out of Harker's SUV, that he had wanted to take her to the hospital immediately, and that he had not threatened to kill her. She also recanted her previous reporting of certain instances of Harker's prior abuse. She told the investigator that she had lied in her prior interview with police when she reported abuse because she had learned Harker was cheating on her and wanted to hurt him. She testified that this recantation was false.

At one point in his questioning of the victim, defense counsel returned to the subject of how many times, in total, Harker had used a weapon against her. Counsel asked whether it was 20 times, as the victim previously told police, or 25 times, as she

4

had testified on direct examination. The victim proceeded to enumerate all of the occasions she could recall, including as part of the tally that Harker had "shot a gun at [her] probably about seven times." When defense counsel began asking for details about the shooting incidents, the trial court ordered a break in the testimony so that an Evidence Code section 402 hearing could be held.

At the hearing, defense counsel began by asking the victim why she had never previously disclosed the shootings when speaking to the police. As part of that colloquy, defense counsel asked: "So if I ask you questions about the other six shootings and why they weren't reported to law enforcement, is your reasoning for not reporting them to law enforcement going to be the same things you've already talked about or do you think it would include other information?" The victim responded: "It would include that he's affiliated with the HA," referring to the Hells Angels. Defense counsel continued, "So if there are any shootings that you didn't report because of any affiliations or gang related things, you know, if you could just tell me now and then I won't ask you about them in front of the jury." The victim explained that Harker wore a lot of Hells Angels clothing and had "threatened [her] with HA a lot of times," saying he would "have his buddies in the HA come after [her]" if she did something.

Based on this testimony, the prosecution asked the trial court to revisit a prior in limine ruling that had prohibited any testimony about Harker's gang affiliation. After further argument from the parties, the court agreed to allow evidence of Harker's gang affiliation "to the extent that [the victim's] belief that Mr. Harker had gang affiliations may have factored into why she was afraid and why she may not have reported." The court explained that it had originally excluded that evidence primarily because the victim's statements and reports had not mentioned Harker's gang membership or its impact. "Now that there has been testimony that the alleged affiliation and her fear associated with that was part of why she didn't report," the court believed it had become relevant. The court specified that, due to the potential for undue prejudice, it would not

5

allow testimony about the details of Harker's asserted gang affiliations. The court stated: "The only way it's relevant is with regard to the reasons [the victim] may not have reported based on her fear and credibility issues." The court observed that the defense was arguing the victim fabricated her testimony and that the jury would be considering why the victim did not report certain incidents sooner if they had actually happened. The court therefore found the gang affiliation testimony relevant for the limited purpose of explaining the victim's fear and addressing "the credibility issues that are presumably going to be argued."

Harker's counsel made an oral motion for a mistrial based on the lack of pretrial disclosure of both the victim's fear of Harker's gang affiliation and the shooting incidents. The trial court denied the motion.

When the victim's cross-examination resumed in front of the jury, defense counsel continued his line of questioning about the seven shooting incidents the victim had referenced. When counsel asked why she had not reported these shootings to law enforcement, the victim answered: "Um, because I was scared. [Harker] had made me believe that there was – he was affiliated with the Hells Angels. So there's a lot of things that I didn't report. It was my belief that the Hells Angels did a lot of bad things. [¶] And that they would do bad things to me."

On redirect, the prosecution asked the victim what was making her so fearful when Harker was threatening to kill her. The victim answered: "[F]rom the time that me and him started dating he had pretty much made it very clear that he was involved with the Hells Angels and that – I mean, I didn't know much about them but I believed they did very heinous crimes against whoever messed with them and I believed he was one of them. I believed he was in the Hells Angels." The prosecutor then asked: "The information that he was involved in the Hells Angels, did Mr. Harker directly convey to you that he was in the Hells Angels?" The victim answered, "Yes."

6

After the prosecution rested, Harker called three witnesses in his defense. The first testified that the victim, while pregnant in late 2020, had thrown a knife at Harker while screaming at him and had jumped out of a car the witness was driving while it was moving at a low speed. The second witness also testified about this incident and further stated that she had never seen the victim with any injury, nor did the witness believe the victim had ever gone to the hospital in the roughly seven months that the victim lived with her and Harker. The third witness described an occasion in early 2021 when he saw the victim and Harker eating lunch and talking together without incident. A fourth defense witness was expected but did not appear.

The jury found Harker guilty on all counts and found true all of the special allegations. In a bifurcated proceeding, after Harker waived his right to a jury trial on the aggravating factors, the trial court found that all of the alleged aggravating factors had been proven.

At sentencing, the trial court acknowledged the filing of the probation officer's presentence report as well as the People's sentencing brief. After announcing its tentative sentencing decision, the court heard argument from both sides. Defense counsel argued that Harker should receive more custody credits than recommended in the presentence report and that, contrary to the report, he should receive only one life term for the torture and aggravated mayhem counts because one of those terms should be stayed under section 654. Defense counsel further requested that all enhancements be dismissed pursuant to section 1385, subdivision (c)(1)(B) and (C), given Harker's exposure to life in prison, and that any fines and fees should not be imposed.

After hearing a statement from the victim, the trial court sentenced Harker to two consecutive terms of life in prison for the torture and aggravated mayhem counts, following completion of an aggregate determinate term of 26 years eight months for the remaining counts.

Harker timely appealed.

7

DISCUSSION

I.

Harker contends that the trial court should have excluded certain evidence admitted at trial.

First, Harker argues that the trial court erred by admitting the victim's testimony that he was associated with the Hells Angels. " 'The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.' " (*People v. Montes* (2014) 58 Cal.4th 809, 859.)

Under Evidence Code section 352, a trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." California courts have long recognized the potentially prejudicial effect of evidence of gang membership. (*People v. Huynh* (2021) 65 Cal.App.5th 969, 980.) As our state high court has explained, "gang-related evidence 'creates a risk the jury will improperly infer the defendant has a criminal disposition,' " and "such evidence should therefore 'be carefully scrutinized by trial courts.' " (*People v. Mendez* (2019) 7 Cal.5th 680, 691.) The risk of injecting undue prejudice is "particularly high" in cases like this one, "where the prosecution has not charged a gang enhancement." (*People v. Flores* (2020) 9 Cal.5th 371, 402.) Still, " 'nothing bars evidence of gang affiliation that is directly relevant to a material issue.' " (*People v. Montes*, *supra*, 58 Cal.4th at p. 859; see *People v. Coneal* (2019) 41 Cal.App.5th 951, 964 [gang evidence admissible if logically relevant to some material issue other than character evidence, not more prejudicial than probative, and not cumulative].)

Evidence of a defendant's gang membership may be relevant to the issue of a witness's credibility. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168-1169;

8

*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.)  Here, as the trial court correctly acknowledged, the victim's credibility was a central issue in this case.  The victim was the only witness to provide a firsthand account of the incidents underlying the charges, and Harker's principal defense was that she had made it all up and was "not to be trusted."  Furthermore, the jury was aware that the victim made inconsistent statements to law enforcement and to hospital personnel about who had harmed her on various occasions and about whether Harker ran her over intentionally in December 2020.  Jurors also heard from defense counsel's questioning and closing argument that the victim never reported the seven shooting incidents mentioned on the stand.  Accordingly, evidence that Harker was in a gang was relevant to explain the victim's delayed, changing, or nonexistent reports of the attacks against her.  (See *Samaniego*, at p. 1169 ["disparities in the witnesses' testimony justified use of gang evidence to provide a plausible explanation for them"].)

We reject Harker's argument that the evidence of his gang affiliation was irrelevant because it only explained why the victim did not report the seven shooting incidents, which were not charged in this prosecution.  To the contrary, the gang evidence bore on her broader delayed and inconsistent reporting of Harker's conduct.  The evidence of Harker's gang ties was also relevant to whether the victim was reasonably in sustained fear during the December 2020 episodes underlying the criminal threats charged in counts 5 and 6, as required for a conviction under section 422.  (See *People v. Wilson* (2010) 186 Cal.App.4th 789, 808 ["fourth and fifth elements of section 422 require the victim 'reasonably to be in sustained fear' for his or her own safety or the safety of his or her family"].)

Moreover, the potential prejudice from evidence of Harker's gang affiliation was minimized by the generalized and brief nature of the victim's gang-related testimony.  The victim did not describe any criminal activities of the gang, nor did she offer any details of Harker's involvement.  She simply testified that her belief that he was a Hells

9

Angels member caused her to take his death threats seriously and to not report various incidents to law enforcement.

Harker argues that this evidence could have confused or misled the jury as to his guilt, but he does not explain how. And contrary to Harker's assertion, it did not consume an undue amount of time to present this evidence to the jury. The relevant testimony regarding Harker's gang affiliation before the jury fills less than one page of the trial transcript. Under these circumstances, we discern no abuse of discretion under Evidence Code section 352 in finding that the probative value of the gang-related evidence outweighed the prejudicial impact it might have on the jury.

Harker also summarily asserts that the victim's testimony that he told her he was involved with the Hells Angels was hearsay under Evidence Code section 1200. As we discuss below in addressing Harker's related claim of ineffective assistance of counsel, to the extent this was hearsay, it was admissible as a statement of a party opponent. (Evid. Code, § 1220.) In sum, there was no error or abuse of discretion in admitting the victim's limited testimony regarding Harker's affiliation with the Hells Angels.

Second, Harker takes issue with the victim having testified to certain subjects that he claims were not disclosed before trial. Harker references the victim's listing of all the times that he assaulted her with a weapon, her testimony that he shot at her on seven occasions, her explanation that she did not report those incidents because of his affiliation with the Hells Angels, and her testimony that on the night she was run over, Harker stopped at his brother's house to retrieve a gun. Harker supplies no legal argument regarding these portions of testimony other than broadly asserting a "Failure of Notice" under section 1054.7. Noncompliance with discovery obligations does not warrant reversal without a showing of prejudice, however (*People v. Reyes* (1974) 12 Cal.3d 486, 502), and Harker makes no attempt to argue how the claimed errors affected the outcome of the case. We therefore need not consider this argument further.

10

II.

Harker additionally raises several grounds of ineffective assistance of counsel. To prevail on such a claim, a defendant must show " 'that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 736; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687.) "A 'reasonable probability' is one that is enough to undermine confidence in the outcome." (*People v. Dennis* (1998) 17 Cal.4th 468, 541.) A defendant must establish " 'prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.' " (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147, quoting *People v. Williams* (1988) 44 Cal.3d 883, 937.)

The defendant must also show that the challenged act or omission " 'was not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make.' " (*People v. Gurule* (2002) 28 Cal.4th 557, 610-611.) "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) " ' "[C]ourts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" (*People v. Scott* (1997) 15 Cal.4th 1188, 1212). "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* [(1998)] 18 Cal.4th 297, 333.)' " (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.) "It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no

11

satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai*, at p. 1009.)

A.

Harker first argues that his trial counsel was ineffective for failing to thoroughly investigate pretrial and failing to call certain expert and lay witnesses to testify.  As to the asserted investigatory failure, Harker claims that none of his attorneys sought pretrial investigative funds or "ancillary services" and that his counsel neither sought funding for experts nor investigated key medical issues.  The record belies some of these claims, as defense counsel averred in his motions to continue the trial date that he was interviewing witnesses, received approval for investigator funds, and filed a petition for disclosure of a related juvenile case file.  In any event, claims involving actions or omissions that occurred outside of the record generally must be reserved for habeas corpus proceedings, where the "relevant facts and circumstances . . . can be brought to light." (*People v. Snow* (2003) 30 Cal.4th 43, 111; see *People v. Diaz* (1992) 3 Cal.4th 495, 557-558 ["Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, rather than on appeal"].)  As we cannot tell from the present record the extent of counsel's investigation, there is no basis for reversal in this direct appeal on grounds of a prejudicially inadequate investigation.

As to the uncalled witnesses, Harker claims that counsel was ineffective in failing to designate medical experts to testify about the amount of blood the victim likely would have lost if her injuries were as she described and about how drug addiction affects memory.  He further argues that counsel should have called additional lay witnesses to impeach the victim's credibility.  Decisions about "whether to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.)  Although Harker's briefs lay out what he believes the testimony of these experts and other witnesses might have been,

12

the record does not establish that they "would have provided exculpatory evidence if called." (*People v. Bolin*, *supra*, 18 Cal.4th at p. 334 [declining to speculate in that regard with respect to defense experts]; *People v. Watts* (2018) 22 Cal.App.5th 102, 118 [rejecting ineffective assistance of counsel claim based on failure to call lay witness due to lack of record evidence of what the witness's testimony would have been].) This distinguishes the present appeal from *In re Hill* (2011) 198 Cal.App.4th 1008, 1017-1021, to which Harker analogizes, where declarations from both the defendant's trial counsel and the uncalled medical expert (among others) were supplied in support of a successful petition for writ of habeas corpus.

Furthermore, the record does not foreclose the possibility that defense counsel intentionally decided that it would be strategic not to call some of the lay witnesses, for he specifically highlighted in his closing remarks the *prosecution's* failure to call three of the same individuals identified in this appeal, offering this omission as a reason for the jury to question the sufficiency of the evidence against Harker. "Whatever counsel's motive for not calling" these individuals as trial witnesses, "the record does not establish that counsel had no reasonable basis for his decision." (*People v. Watts*, *supra*, 22 Cal.App.5th at p. 118.) If Harker wishes to pursue this claim, he may do so by petition for writ of habeas corpus.

In discussing the need for expert testimony, Harker also briefly raises defense counsel's failure to argue to the jury that the victim's leg injury could not have been sustained at the time she said it was based on when she ultimately received treatment at the hospital. Harker fails to show, however, that there was no rational tactical reason for counsel to omit such an argument in light of his other arguments challenging the victim's credibility. (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.) And in any event, we see no reasonable probability that making that argument would have produced a more favorable result at trial.

13

B.

We turn next to Harker's twin arguments that defense counsel performed ineffectively at the Evidence Code section 402 hearing by opening the door to the admission of the victim's testimony that he was affiliated with the Hells Angels. First, Harker questions counsel's choice to ask the victim, at the hearing, what information she might reveal if asked further questions about the prior shootings she mentioned and why she did not report them. Second, Harker challenges counsel's failure to object under Evidence Code section 766 to what he contends was a nonresponsive answer to that question.

Starting with the latter point, an objection under Evidence Code section 766 would have lacked merit. Defense counsel asked whether the victim's response to further questions about the prior shootings would consist of her previously stated reasoning for not reporting or if "it would include other information." The victim answered: "It would include that he's affiliated with the HA." As this answer was responsive to the question asked, counsel was not ineffective for failing to object. (*People v. Mitcham*, *supra*, 1 Cal.4th at p. 1080 ["failure to make a meritless objection does not constitute deficient performance"]; *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections"].)

As to counsel's decision to pursue this line of questioning at the Evidence Code section 402 hearing in the first place, we likewise see no deficient performance. The record does not affirmatively establish that defense counsel, presented with the victim's unexpected testimony about undisclosed prior shootings, lacked a rational tactical reason to inquire, outside the jury's presence, about where further questioning on that topic would lead. The fact that the victim answered that it would lead to discussion of Harker's gang affiliation and that the trial court ultimately reversed its prior decision on the admissibility of such evidence does not foreclose the possibility that counsel had a

14

reasonable tactical purpose for this questioning at the outset. (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009 [reviewing court defers to counsel's reasonable tactical decisions].)

### C.

Harker also contends that his counsel was ineffective for failing to assert a hearsay objection to the victim's trial testimony that he told her that he was a member of the Hells Angels. Even assuming this testimony contained an out-of-court statement offered to prove the truth of the matter (Evid. Code, § 1200 [hearsay definition]), that statement was being offered against Harker, "the declarant in an action to which he is a party" (Evid. Code, § 1220) and was thus admissible under the party-admission exception to the hearsay rule. (*People v. Flinner* (2020) 10 Cal.5th 686, 735 [Evid. Code, § 1220 covered statement by criminal defendant that harmed his case].) Therefore, counsel was not ineffective in failing to make a hearsay objection. (*People v. Mitcham*, *supra*, 1 Cal.4th at p. 1080.)

In his reply brief, Harker additionally argues that, even if the statement was "technically admissible," counsel should have objected that it was unduly prejudicial under Evidence Code section 352. Given that defense counsel had already argued against admitting gang-related evidence at the end of the Evidence Code section 402 hearing and the trial court had already determined that such evidence was admissible to some extent, in what we have already concluded was not an abuse of discretion, this, too, would have been a futile objection. And in any event, the contention is forfeited for failure to raise it in the opening brief. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)

### D.

As a final ground of ineffective assistance of counsel, Harker contends that his counsel failed to file a sentencing memorandum or otherwise present mitigating evidence, despite knowing that Harker faced severe penalties for the offenses of conviction. Harker acknowledges that counsel is not required to file a sentencing memorandum, and, once again, the record on appeal does not allow us to determine whether counsel's failure to

file one or to otherwise advance arguments based on Harker's background and character was the product of considered analysis and strategy or, as Harker maintains, deficient performance.

Harker faults counsel for failing to argue for mitigation based on his "biographical history," "personal hardships," "letters from family and friends," or "reports from experts." But he does not specify what mitigating evidence within these categories existed and should have been adduced. Harker's additional claim that counsel made "no substantive arguments for leniency" is refuted by counsel's oral argument at sentencing that either the life sentence for the torture conviction or the life sentence for the aggravated mayhem conviction should be stayed under section 654. Moreover, Harker does not identify what additional arguments should have been made or explain why, if pressed, they likely would have yielded a lower sentence. And in any event, as Harker recognizes, claims of ineffective assistance of counsel regarding omission of "penalty phase arguments must properly await resolution on a fully developed factual record in a habeas corpus proceeding . . . ." (*People v. Snow*, *supra*, 30 Cal.4th at p. 118.) Should Harker wish to pursue this claim, he may bring a petition for writ of habeas corpus.

DISPOSITION

The judgment is affirmed.

/s/
FEINBERG, J.

We concur:


/s/
RENNER, Acting P. J.


/s/
KRAUSE, J.

16